1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

10

11  PRIME HEALTHCARE SERVICES,
    INC., and PRIME HEALTHCARE
12  FOUNDATION, INC.,

13                              Plaintiffs,

14  v.

15  KAMALA D. HARRIS, in her personal
    capacity and in her official capacity as the
16  Attorney General of the State of California,

17                              Defendant.

18
19
20
21
22
23
24
25
26
27
28

Case No.:  3:16-cv-00778-GPC-RBB

**ORDER:**

**(1) DENYING DEFENDANT'S
MOTION TO DISMISS PLAINTIFFS'
FIRST AMENDED COMPLAINT
PURSUANT TO FED. R. CIV. P.
12(b)(1)**

**(2) GRANTING DEFENDANT'S
MOTION TO DISMISS PLAINTIFFS'
FIRST AMENDED COMPLAINT
PURSUANT TO FED. R. CIV. P.
12(b)(6)**

**(3) DENYING AS MOOT
PLAINTIFFS' EX PARTE
APPLICATION TO STRIKE NEW
ARGUMENTS AND EVIDENCE IN
DEFENDANT'S REPLY BRIEF**

**[ECF Nos. 49, 50.]**

1

Before the Court is Defendant Kamala D. Harris's ("Defendant's" or "Harris's") motion to dismiss Plaintiffs Prime Healthcare Services, Inc. and Prime Healthcare Foundation, Inc.'s ("Plaintiffs'" or "Prime's") First Amended Complaint ("FAC") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[1]  (Dkt. No. 49.)[2]  The motion has been fully briefed.  (Dkt. Nos. 26–28, 31–33.)  Plaintiffs also filed an Ex Parte Application to Strike New Arguments and Evidence in Defendant's Reply Brief on March 3, 2016.  (Dkt. No. 50.)[3]  The Ex Parte Application has been fully briefed.  (Dkt. No. 36.)

The Court held a hearing on the motions on September 30, 2016.  (Dkt. No. 51.) John Mills, Esq. appeared on behalf of Plaintiffs.  (*Id.*)  S. Michele Inan, Esq., Marc LeForestier, Esq., and Sharon O'Grady, Esq. appeared on behalf of Defendant.  (*Id.*)

Having reviewed the parties' motions and the applicable law, and for the reasons set forth below, the Court (1) **DENIES** Defendant's motion to dismiss Plaintiffs' FAC pursuant to Federal Rule of Civil Procedure 12(b)(1), (2) **GRANTS** Defendant's motion to dismiss Plaintiffs' FAC pursuant to Federal Rule of Civil Procedure 12(b)(6), and (3) **DENIES AS MOOT** Plaintiffs' Ex Parte Application to Strike New Arguments and Evidence in Defendant's Reply Brief.[4]

---

[1] Citations are based upon CM/ECF pagination.

[2] After it was transferred to the undersigned judge, Defendant's motion to dismiss Plaintiffs' FAC (originally Dkt. No. 18) was renumbered as Dkt. No. 49.

[3] After it was transferred to the undersigned judge, Plaintiffs' Ex Parte Application to Strike New Arguments and Evidence in Defendant's Reply Brief (originally Dkt. No. 35) was renumbered as Dkt. No. 50.

[4] In reaching its decision, the Court did not rely on the evidence and arguments concerning the BlueMountain transaction that Defendant raised in its reply brief (Dkt. No. 31).  Accordingly, the Court finds it proper to deny as moot Plaintiffs' Ex Parte Application to Strike New Arguments and Evidence in Defendant's Reply Brief (Dkt. No. 50).  *See, e.g.*, *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, No. 08-CV-335-IEG-NLS, 2013 WL 4068833, at *18 (S.D. Cal. Aug. 12, 2013) (denying as moot motion to strike because the court did not rely on the contested evidence in reaching its decision).

## BACKGROUND

### I.    The Parties

Plaintiff Prime Healthcare Services, Inc. is a California corporation that owns and operates twenty-eight hospitals throughout the country.  (Dkt. No. 14, FAC ¶ 21.)  Plaintiff Prime Healthcare Foundation, Inc. is a nonprofit public charity that owns seven nonprofit hospitals, each of which was donated by Prime Healthcare Services, Inc., in various states.[5]  (*Id.* ¶ 22.)  Defendant Kamala D. Harris is the Attorney General of California.  (*Id.* ¶ 24.)  This action stems from Harris's allegedly improper, *de facto* denial of Prime's proposed acquisition of the Daughters of Charity Health System ("DCHS").  (*Id.* ¶¶ 1, 2, 14.)

### II.    Statutory and Regulatory Background

The Attorney General supervises all charitable organizations and enforces the obligations of trustees, nonprofits, and fiduciaries that hold or control property in trust for charitable purposes.[6]  Pursuant to California Corporations Code §§ 5914–5925 ("Nonprofit Hospital Transfer Statute" or "Statute"), a nonprofit corporation that operates a health facility must provide notice to and obtain the written consent of the Attorney General prior to entering into an agreement to sell a material amount of its assets to a for-profit corporation.[7]  Cal. Corp. Code § 5914(a)(1).  The Attorney General has "discretion

---

[5] Prime Healthcare Services, Inc. and Prime Healthcare Foundation, Inc. will be referred to collectively as "Plaintiffs" or "Prime."

[6] Supervisory and enforcement authority is granted to the Attorney General under the Supervision of Trustees and Fundraisers for Charitable Purposes Act (Cal. Gov't Code §§ 12580–12599.8), the Nonprofit Corporation Law (Cal. Corp. Code §§ 5000–6216), the Solicitations for Charitable Purposes Law (Cal. Bus. & Prof. Code §§ 17510–17510.95), and provisions of the California Business and Professions Code that prohibit unlawful, unfair, or fraudulent business acts or practices within this State (id. §§ 17200–17210).

[7] Cal. Corp. Code §§ 5914–5919 govern transactions from nonprofit entities to for-profit entities.  Cal. Corp. Code §§ 5920–5923 govern transactions between nonprofit entities.

to consent to, give conditional consent to, or not consent to any agreement or transaction." Cal. Corp. Code § 5917.

In making her determination, the Attorney General "shall consider any factors that the Attorney General deems relevant," including, but not limited to a list of nine factors specified by the Statute. *Id.*; Cal. Code Regs. tit. 11, § 999.5(f). The factors include, *inter alia*, whether the transaction "may create a significant effect on the availability or accessibility of health care services to the affected community," Cal. Corp. Code § 5917(h), and whether the transaction is "in the public interest," Cal. Corp. Code § 5917(i). If consent is granted to a transaction, the Attorney General's policy is to "require for a period of at least five years the continuation at the hospital of existing levels of essential healthcare services, including but not limited to emergency room services." Cal. Code Regs. tit. 11, § 999.5(f)(8)(C). Notwithstanding this policy, the Attorney General "retain[s] complete discretion to determine whether this policy shall be applied in any specific transaction under review." *Id.*

The Attorney General considers information from a variety of sources in making her determination on a proposed transaction. The selling entity must submit to the Attorney General information about the transaction, reasons for the sale, the fair market value of the transaction, and the impact of the sale on the availability and accessibility of healthcare services in the community affected by the sale, among other information. Cal. Corp. Code § 5914(b); Cal. Code Regs. tit. 11, § 999.5(d). The Attorney General may also request that the seller provide additional information that she deems reasonably necessary to make her determination. Cal. Code Regs. tit. 11, § 999.5(c)(2). Before issuing a written decision, the Attorney General must conduct one or more public meetings in order to hear comments from interested parties. Cal. Corp. Code § 5916. The Attorney General's policy is to receive and consider all relevant information concerning the proposed transaction from "[a]ny interested person." Cal. Code Regs tit. 11, § 999.5(e)(7). The Attorney General may contract with consultants and experts to

review the proposed sale or receive expert opinion from any state agency.  Cal. Code Regs. tit. 11, § 999.5(e)(4).

If a proposed transaction affects an acute care hospital with more than fifty beds or may result in a significant effect on the availability or accessibility of existing healthcare services, the Attorney General prepares an independent healthcare impact statement that evaluates the transaction's potential impact on the availability and accessibility of services to the affected community.  Cal. Code Regs. tit. 11, § 999.5(e).  The independent statement may assess factors such as the transaction's potential impact on the "level and type of charity care that the hospital has historically provided" and the "provision of health care services to Medi-Cal patients, county indigent patients, and any other class of patients."  Cal. Code Regs. tit. 11, § 999.5(e)(6).  The information in the statement is then used to consider whether the proposed transaction may "create a significant effect on the availability or accessibility of health care services," one of the nine factors listed in Cal. Corp. Code § 5917.  Cal. Code Regs. tit. 11, § 999.5(e).  The statement is public.  Cal. Code Regs. tit. 11, § 999.5(e)(3)(D).

The Attorney General notifies the applicant of her decision in writing.  Cal. Corp. Code § 5915.  Her decision is reviewable in state court in an administrative mandamus proceeding.  Cal. Civ. Proc. Code § 1085.

### III.    Factual Background

### A. The Alleged Illegal Agreement Between Harris and SEIU-UHW

Since 2009, Prime has been engaged in a protracted dispute with the Service Employees International Union-United Healthcare Workers West ("SEIU-UHW"), a labor union that represents California hospital workers, in part due to its unwillingness to allow SEIU-UHW to unionize Prime's California hospitals.[8]  (FAC ¶ 10.)  Prime alleges

---

[8] In 2011, Prime Healthcare Services, Inc. filed suit alleging that SEIU, UHW, Kaiser Permanente, and several Kaiser-related entities engaged in an antitrust conspiracy to eliminate Prime from the healthcare market and increase healthcare workers' wages.  *Prime Healthcare Servs., Inc. v. Serv. Employees Int'l Union*, No. 11-CV-2652-GPC-RBB, 2013 WL 3873074, at *1 (S.D. Cal. July 25, 2013), *aff'd*, 642 F.

that Harris entered into an illegal scheme with SEIU-UHW: in exchange for SEIU-UHW's political and financial support, Harris would prevent Prime from acquiring nonprofit hospitals in California until Prime agreed to allow SEIU-UHW to unionize its hospital workers.  (*Id.* ¶ 93.)  Prime alleges that pursuant to this unlawful scheme, Harris "refused to reasonably approve the sale of [DCHS] to [Prime] because Prime rejected SEIU-UHW's extortionate demands to unionize workers at all Prime hospitals and did so in *quid pro quo* exchange for the union's continuing financial support of her political career, including her current candidacy for the U.S. Senate."  (*Id.* ¶ 1.)

    As evidence for this scheme, Prime cites SEIU-UHW's donations to Harris's 2010 and 2014 campaigns for Attorney General.  (*Id.* ¶ 40.)  Prime alleges on information and belief that SEIU-UHW promised Harris up to $25 million in political contributions to her U.S. Senate campaign if she denied Prime's acquisition or imposed conditions that would effect a *de facto* denial of the DCHS sale.  (*Id.* ¶ 41.)

**B. The VVCH Transaction[9]**

    In 2011, Harris denied consent to Prime's proposed acquisition of Victor Valley Community Hospital ("VVCH").  (*Id.* ¶¶ 45–48.)  Prime asserts that Harris's denial of the VVCH transaction was the first and only time Harris has denied the sale of a California nonprofit hospital.  (*Id.* ¶ 54.)

    Prime asserts that Harris denied the 2011 VVCH sale pursuant to her unlawful agreement with SEIU-UHW.  (*Id.* ¶ 93.)  As evidence, Prime cites examples of statements and conduct by SEIU-UHW.  An SEIU-UHW attorney stated at a bankruptcy hearing that Harris would deny the VVCH transaction; SEIU-UHW campaigned against the sale; and SEIU-UHW opposed the sale at the Attorney General's public hearing on

---

App'x 665 (9th Cir. 2016).  In 2014, Prime filed suit alleging that the SEIU, UHW, and other related entities and individuals engaged in a Racketeering Influenced and Corrupt Organization Act conspiracy to unionize Prime or force Prime out of the healthcare market.  *Prime Healthcare Servs., Inc. v. Servs. Employees Int'l Union*, 147 F. Supp. 3d 1094, 1097 (S.D. Cal. 2015).

[9] Prime does not seek relief related to the VVCH transaction.

the transaction.  (*Id.* ¶¶ 45, 47, 50.)  After Harris denied Prime's proposed acquisition of VVCH, SEIU-UHW publicly claimed credit for the decision.  (*Id.* ¶ 62.)  During labor negotiations with Prime in July 2014, Dave Regan, president of SEIU-UHW, stated that Harris denied the VVCH sale to Prime at the union's request.  (*Id.* ¶ 53.)

**C. The DCHS Transaction**

Facing financial difficulty in 2014, the Daughters of Charity Health System decided to sell five nonprofit hospitals and a skilled nursing facility that it owns and operates in California.[10]  (*Id.* ¶¶ 3, 65, 94.)  After a thirteen-month bidding process, DCHS selected Prime's bid to purchase the hospitals.  (*Id.* ¶¶ 4, 7, 78.)  DCHS and Prime's sale agreement required Prime to keep each of the hospitals open and to "maintain all existing healthcare services, including emergency rooms and trauma centers, for at least five years."  (*Id.* ¶ 78.)  DCHS submitted written notice of the proposed sale to the Attorney General on October 24, 2014.  (*Id.* ¶¶ 8, 81.)  Prime alleges that its proposed acquisition was "the single largest hospital transaction ever reviewed by the Attorney General's office."  (*Id.* ¶¶ 8, 9.)

The Attorney General's Office made public five healthcare impact statements assessing the effects of the proposed sale on the availability and accessibility of healthcare services.  (Dkt. Nos. 18-3–18-7, Defendant's Request for Judicial Notice ("Def.'s RJN I"), Ex. 1–5.)[11]  The statements, prepared by a healthcare consultant,

---

[10] The hospitals are (1) Seton Medical Center in Daly City, California, (2) O'Connor Hospital in San Jose, California, (3) Saint Louise Regional Hospital in Gilroy, California, (4) St. Francis Medical Center in Lynwood, California, and (5) St. Vincent Medical Center in Los Angeles.  (FAC ¶ 3.)  The skilled nursing facility is Seton Coastside in Moss Beach, California.  (*Id.*)

[11] Generally, a court cannot consider matters outside of the complaint on a Rule 12(b)(6) motion to dismiss, unless those matters are: 1) authenticated documents that have been incorporated by the complaint or 2) facts subject to judicial notice.  *Lee v. City of Los Angeles*, 250 F.3d 668, 689–90 (9th Cir. 2001).  Documents may be incorporated into a complaint when the plaintiff "refers extensively" to the document or when the document forms the basis of the plaintiff's claims.  *U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  Courts may take judicial notice of adjudicative facts that are "not subject to reasonable dispute."  Fed. R. Evid. 201(b).  Indisputable facts are those that are "generally known" or

recommended that four of the five hospitals and the skilled nursing facility be required to maintain emergency and specific essential services for ten years in order to minimize potential negative consequences.  (Def.'s RJN I, Ex. 1 at 95–105; Ex. 3 at 91–99; Ex. 4 at 87–95; Ex. 5 at 82–89.)  Prime alleges that Harris specifically requested that these statements include the ten-year conditions.  (FAC ¶¶ 15, 82, 85, 90.)  On information and belief, Prime alleges that Harris made this request "before the report or any studies had been generated."  (*Id.* ¶ 82.)  In January 2015, the Attorney General received written

---

that "can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned."  *Id.*

Defendant filed two Requests for Judicial Notice in this case.  (Dkt. Nos. 18-2, 33.)  Plaintiffs opposed Defendant's first Request for Judicial Notice ("Def.'s RJN I").  (Dkt. No. 26.)  Plaintiffs objected to Exhibits 1–6 and 14 primarily on grounds that the exhibits were offered for the truth of their contents and to dispute material facts.  (*Id.*)  They objected to Exhibits 7–11 on grounds that the exhibits contravene Federal Rule of Evidence 201(b) and are not properly noticeable under the "incorporation by reference" doctrine.  (*Id.*)  They also objected to Exhibit 15 on relevance grounds.  (*Id.*)  Defendant responded to Plaintiffs' objections.  (Dkt. No. 32.)  Because the Court did not rely on Exhibits 7–11 and 14–15 in reaching its ruling, the Court denies as moot Defendant's first Request for Judicial Notice as to those specific exhibits.  *See, e.g.*, *Medina v. Cty. of San Diego*, No. 08CV1252 AJB RBB, 2012 WL 1033019, at *6 (S.D. Cal. Mar. 26, 2012) (denying as moot requests for judicial notice because they were not necessary for resolution of the pending motions).  Exhibits 1–6 are publicly available government records that are not subject to reasonable dispute and whose accuracy cannot be reasonably questioned.  *See Siebert v. Gene Sec. Network, Inc.*, 75 F. Supp. 3d 1108, 1111 n.2 (N.D. Cal. 2014).  Exhibits 12–13 are incorporated by reference in Plaintiffs' FAC, and Plaintiffs do not object to this evidence.  *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).  The Court therefore grants Defendant's first Request for Judicial Notice as to Exhibits 1–6 and 12, but the Court will not, as Plaintiffs request, consider these documents for the truth of the matters asserted therein.  *See, e.g.*, *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1067 (N.D. Cal. 2010) (granting defendants' request to take judicial notice of SEC filings, but specifying that they will not "where inappropriate" be considered for the truth of the matter asserted").

Defendant subsequently filed a second Request for Judicial Notice ("Def.'s RJN II") with its reply brief.  (Dkt. No. 33.)  In their Ex Parte Application to Strike New Arguments and Evidence in Defendant's Reply Brief, Plaintiffs requested that Exhibits 16 and 18–22 be stricken as improperly raised new evidence.  (Dkt. No. 50.)  Because the Court did not rely on the exhibits attached to Defendant's second Request for Judicial Notice to resolve the present motions, the Court denies as moot Defendant's second Request for Judicial Notice.  *See, e.g.*, *Medina*, 2012 WL 1033019, at *6.

Plaintiffs filed an unopposed Request for Judicial Notice ("Pls.' RJN").  (Dkt. No. 28.)  Because both attached exhibits are publicly available government records that are not subject to reasonable dispute and whose accuracy cannot be reasonably questioned, the Court grants Plaintiffs' Request for Judicial Notice.  *See Siebert*, 75 F. Supp. 3d at 1111 n.2.

comments and held multiple public hearings over a period of five days to receive input on the proposed sale.  (*Id.* ¶ 84.)

On February 20, 2015, the Attorney General conditionally consented to the sale. (*Id.* ¶¶ 14, 89.)  The Attorney General imposed a number of conditions on the sale.  (*Id.*) The conditions at issue in this instant case require Prime to operate the five hospitals as acute care facilities for ten years and to maintain the majority of current hospital services at each hospital (with the exception of St. Vincent Medical Center) for ten years.[12]  (*Id.*) Staff members of the Attorney General's Office informed Prime that Harris requested the ten-year conditions.  (*Id.* ¶¶ 15, 82, 85, 90.)  Prime alleges that the Attorney General's ten-year conditions were unprecedented and rendered the proposed transaction operationally and financially unviable, requiring Prime to operate the financially failing hospitals at a loss for ten years.[13]  (*Id.* ¶¶ 18, 92, 94, 96.)  Accordingly, Prime characterizes the Attorney General's conditional approval of the DCHS sale as a *de facto* denial.  (*Id.* ¶¶ 14, 85, 94, 95.)  On March 10, 2015, Prime withdrew its bid to purchase the DCHS hospitals because of the ten-year conditions.  (*Id.*)

Prime asserts that Harris issued a *de facto* denial of Prime's acquisition pursuant to her agreement with SEIU-UHW.  (*Id.* ¶¶ 1, 2, 17, 41, 93.)  As evidence, Prime cites examples of statements and conduct by SEIU-UHW.  SEIU-UHW created a website to oppose Prime's bid.  (*Id.* ¶ 68.)  SEIU-UHW aired television ads and initiated a calling

---

[12] The Attorney General required Prime to (1) continue emergency services, including a Level II Trauma Center with on-call trauma services, and other medical services for ten years at St. Francis Medical Center (Def.'s RJN I, Ex. 6 at 4–6, conditions IV– VI); (2) continue skilled nursing services and stand-by emergency services for ten years at Seton Coastside (*id.* at 37, condition VI); (3) continue emergency and some medical services for ten years, and continue other medical services for five years at Seton Medical Center, O'Connor Hospital, and Saint Louise Regional Hospital (*id.* at 36–37, conditions IV–V (Seton)); 51–52, conditions IV–V (O'Connor); 66–67, conditions IV–V (Saint Louise)); and (4) continue emergency and other medical services for five years at St. Vincent Medical Center (*id.* at 20–21, condition IV).

[13] Prime acknowledges that Harris has previously required the continuing provision of women's health services for ten years in conditionally approving other transactions.  (FAC § 96.)

campaign urging Harris to deny consent to the sale.  (*Id.* ¶ 79.)  SEIU-UHW and a competing bidder met with Harris to show Harris that an alternative buyer existed.  (*Id.* ¶ 83.)  SEIU-UHW passed a resolution calling on Harris to halt the sale of any hospital to Prime until investigations of Prime for alleged Medicare fraud were resolved.  (*Id.* ¶ 73.)  SEIU-UHW issued a press release announcing that twenty-seven state legislators had submitted a letter to Harris asking her to stop the sale to Prime.  (*Id.* ¶ 74.)  SEIU-UHW issued a subsequent announcement that thirty-eight state legislators, two U.S. representatives, and other elected officials had signed on to the letter to Harris.  (*Id.*)  Prime alleges that SEIU-UHW threatened to withdraw its support for any Democratic politician who accepted contributions from Prime.  (*Id.*)  SEIU-UHW comprised the main source of opposition to the Prime-DCHS deal.  (*Id.* ¶¶ 79, 80, 84.)

Dave Regan, the president of SEIU-UHW, repeatedly informed Prime and DCHS that Harris would approve Prime's acquisition only if Prime agreed to allow SEIU-UHW to unionize workers at Prime's hospitals.  (*Id.* ¶¶ 9 –11, 42, 43, 64, 71, 72, 85.)  Regan informed Prime that "he has the influence with Harris to either make or break Prime with respect to the Prime-DCHS sale transaction," that Harris "would do what she was told and nothing more," that "a SEIU-UHW deal was the price for doing business in California and obtaining a sale approval from Harris," and that Regan "control[s] Harris and the political process in California."  (*Id.* ¶¶ 42, 71, 85.)  DCHS representatives allegedly informed Prime that Harris would deny Prime's acquisition or require financially unviable conditions unless Prime agreed to SEIU-UHW's demands.  (*Id.* ¶¶ 9, 12.)  SEIU-UHW publicly took credit for Harris's decision to impose "unprecedented conditions" on Prime's acquisition of DCHS.  (*Id.* ¶ 91.)

On July 31, 2015, DCHS submitted notice to the Attorney General of a proposed sale to Blue Mountain Capital Management, LLC ("Blue Mountain").  (*Id.* ¶ 99.)  Prime speculates that the Attorney General will approve this transaction and impose five-year, instead of ten-year, conditions.  (*Id.* ¶ 98.)

/ / / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### IV.   Procedural Background

Plaintiffs filed a Complaint in the United States District Court for the Central District of California on September 21, 2015 (Dkt. No. 1) and filed a FAC on November 12, 2015 (Dkt. No. 14).

Plaintiffs assert five claims for relief in the FAC: (1) a 42 U.S.C. § 1983 claim for violation of Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment; (2) a 42 U.S.C. § 1983 claim for violation of Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment; (3) a 42 U.S.C. § 1983 claim for violation of Plaintiffs' rights under the National Labor Relations Act, 29 U.S.C. §§ 151–169; (4) a declaratory judgment that Cal. Corp. Code §§ 5914–5925 is unconstitutional under the Fourteenth Amendment, both facially and as applied to Plaintiffs; and (5) a permanent injunction enjoining Harris from enforcing Cal. Corp. Code §§ 5914–5925, both generally and with respect to Plaintiffs.  (Dkt. No. 14.)

Defendant moved to transfer the case to the United States District Court for the Southern District of California, or, in the alternative, to dismiss Plaintiffs' FAC on November 30, 2015.  (Dkt. Nos. 17, 18.)  Defendant's motion to transfer was granted on March 31, 2016 by Chief Judge George H. King of the United States District Court for the Central District of California.  (Dkt. No. 38.)  Accordingly, Defendant's motion to dismiss (Dkt. No. 18) and Plaintiffs' Ex Parte Application to Strike New Arguments and Evidence in Defendant's Reply Brief (Dkt. No. 35) were denied without prejudice to their reassertion in the transferee court.  (Dkt. No. 38.)  On April 12, 2016, the parties jointly moved the Court to accept as reasserted and filed Defendant's motion to dismiss Plaintiffs' FAC and Plaintiffs' Ex Parte Application, together with all related briefing.  (Dkt. No. 42.)  Judge John A. Houston of the United States District Court for the Southern District of California granted the parties' joint motion on April 12, 2016.  (Dkt. No. 43.)  The case was reassigned to the undersigned judge on July 11, 2016.  (Dkt. No. 44.)

/ / / /

1

**LEGAL STANDARDS**

2     **A.   Rule 12(b)(1)**

3         Federal Rule of Civil Procedure ("Rule") 12(b)(1) provides for dismissal of a

4     complaint for lack of subject-matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  "The Article

5     III case or controversy requirement limits federal courts' subject-matter jurisdiction by

6     requiring . . . that plaintiffs have standing and that claims be 'ripe' for adjudication."

7     *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1121 (9th Cir. 2010).  Lack

8     of Article III standing requires dismissal for lack of subject matter jurisdiction under Rule

9     12(b)(1).  *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).  The threshold

10    question of whether a plaintiff has standing is distinct from the merits of his or her claim.

11    *Id.* at 1068.

12    **B.   Rule 12(b)(6)**

13        A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the

14    sufficiency of a complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

15    Dismissal is warranted under Rule 12 (b)(6) where the complaint lacks a cognizable legal

16    theory.  *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984); *see*

17    *also Neitzke v. Williams*, 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to

18    dismiss a claim on the basis of a dispositive issue of law.").  Alternatively, a complaint

19    may be dismissed where it presents a cognizable legal theory yet fails to plead essential

20    facts under that theory.  *Robertson*, 749 F.2d at 534.  While a plaintiff need not give

21    "detailed factual allegations," a plaintiff must plead sufficient facts that, if true, "raise a

22    right to relief above the speculative level."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

23    545 (2007).  "To survive a motion to dismiss, a complaint must contain sufficient factual

24    matter, accepted as true, to 'state a claim to relief that is plausible on its face."  *Ashcroft*

25    *v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 547).  A claim is

26    facially plausible when the factual allegations permit "the court to draw the reasonable

27    inference that the defendant is liable for the misconduct alleged."  *Id.*  In other words,

28    "the non-conclusory 'factual content,' and reasonable inferences from that content, must

3:16-cv-00778-GPC-RBB

be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all factual allegations and must construe all inferences from them in the light most favorable to the nonmoving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002); *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). Legal conclusions, however, need not be taken as true merely because they are cast in the form of factual allegations. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1200 (9th Cir. 2003); *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981). When ruling on a motion to dismiss, the court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when authenticity is not contested, and matters of which the court takes judicial notice. *Lee v. Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001).

## DISCUSSION

### I.   Standing

To satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and 3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (U.S. 2000).

Defendant contends that Prime's allegations of injury are speculative and hypothetical. (Dkt. No. 49-1 at 24–26.) Defendant focuses on three allegations: that Prime is (1) prevented from lawfully acquiring and operating DCHS pursuant to the sale agreement, (2) potentially subject to an action by DCHS for breach of the agreement, and

1  (3) unlawfully prevented by Harris from acquiring other California nonprofit hospitals so

2  long as Prime continues to reject SEIU-UHW's unionization demands.  (*Id.* at 25.)

3        Defendant overlooks Prime's core allegation of injury.  Prime alleges that the

4  financially unviable conditions Harris imposed on the DCHS transaction forced it to

5  abandon its $843 million bid to acquire DCHS on March 10, 2015.  (FAC ¶¶ 18, 92.)

6  Prime's alleged lost business opportunity and corresponding economic harm constitutes

7  an injury in fact.  *See, e.g.*, *Wedges/Ledges of California, Inc. v. City of Phoenix, Ariz.*, 24

8  F.3d 56, 60 (9th Cir. 1994) (finding plaintiffs suffered an injury in fact by alleging that

9  the city's revocation of existing licenses and blanket ban on new licenses caused

10  plaintiffs to suffer "lost sales, lost profits, lost business opportunities and other economic

11  harms"); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261–63

12  (1977) (concluding that a nonprofit developer had standing to challenge the denial of its

13  petition for rezoning and seek injunctive and declaratory relief, despite the fact that its

14  land-purchase contract was contingent upon securing rezoning).  Prime's allegation that

15  Defendant's conduct pressured it to unionize its hospitals also suffices to show an injury

16  in fact.  *See Viceroy Gold Corp. v. Aubry*, 75 F.3d 482, 488 (9th Cir. 1996) (finding

17  injury in fact where plaintiff alleged that it suffered "competitive disadvantage . . .

18  relative to unionized mines and the pressure to unionize").

19        Defendant's argument that Prime's allegations of future injury are hypothetical is

20  unavailing.  A plaintiff "does not have to await the consummation of threatened injury to

21  obtain preventive relief."  *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154 (9th Cir. 2000)

22  (internal citation omitted).  While "past wrongs do not in themselves amount to [a] real

23  and immediate threat of injury necessary to make out a case or controversy," *City of Los*

24  *Angeles v. Lyons*, 461 U.S. 95, 103 (1983), "evidence of past instances of enforcement is

25  important in a standing inquiry," *LSO, Ltd.*, 205 F.3d at 1154.  Prime, which is in the

26  business of buying and operating hospitals, infers from Harris's obstruction of two of its

27  proposed acquisitions of nonprofit hospitals that it will continue to lose business goodwill

28  and future opportunities to purchase hospitals in California.  (FAC ¶¶ 64, 105.)

Furthermore, "[i]t is sufficient for standing purposes that the plaintiff intends to engage in a course of conduct arguably affected with a constitutional interest and that there is a credible threat that the challenged provision will be invoked against the plaintiff." *LSO, Ltd.*, 205 F.3d at 1155 (internal citation and quotation marks omitted). Should Prime attempt to purchase nonprofit hospitals in California in the future, its transactions are necessarily subject to the Attorney General's review pursuant to the Nonprofit Hospital Transfer Statute, which Prime argues is unconstitutional.

Finally, Prime meets the causation and redressability requirements for standing. Prime alleges that Harris's imposition of the ten-year conditions on the DCHS transaction caused Prime's inability to further pursue its bid and complete the acquisition. (FAC ¶¶ 18, 92.) Prime's requests for declaratory and injunctive relief, if granted, would redress its injury by preventing Defendant from unlawfully impeding Prime's purchases of California nonprofit hospitals. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977) (finding redressability where the denial of a rezoning petition stood as a barrier to a nonprofit developer's construction of housing that it had contracted to build, and where securing injunctive relief would remove the barrier); *see also Graham v. Fed. Emergency Mgmt. Agency*, 149 F.3d 997, 1003 (9th Cir. 1998), *abrogated on other grounds by Levin v. Commerce Energy, Inc.*, 560 U.S. 413 (2010) (recognizing that "[p]laintiffs need not demonstrate that there is a 'guarantee' that their injuries will be redressed by a favorable decision" but "only that a favorable decision is *likely* to redress" their injuries) (internal citation and quotation marks omitted).

In sum, Plaintiffs have sufficiently alleged that they have standing to pursue their claims at the pleadings stage. Accordingly, the Court **DENIES** Defendant's motion to dismiss Plaintiffs' FAC pursuant to Federal Rule of Civil Procedure 12(b)(1).

## II.   Plaintiffs' *Quid Pro Quo* Allegations

Throughout its FAC, Prime relies on the existence of an illegal agreement between Harris and SEIU-UHW to support various causes of action.  Prime acknowledges that its *quid pro quo* allegations are not vital to the Court's disposition of this case, and it does

not assert a separate claim for relief on conspiracy grounds.[14]  Nonetheless, Prime marshals its *quid pro quo* allegations to argue that it possesses a cognizable property interest under the Fourteenth Amendment; that Harris's reasons for *de facto* denying Prime's DCHS acquisition were pretextual for purposes of Prime's class-of-one equal protection claim; that Harris imposed upon Prime an implicit condition to unionize in violation of the NLRA; and that the Nonprofit Hospital Transfer Statute is void for vagueness.  Because Prime's *quid pro quo* allegations pervade Prime's various arguments, the Court finds it appropriate to first address these allegations prior to addressing each of Prime's claims in turn.

Defendant contends that Prime's allegations of a *quid pro quo* scheme between Harris and SEIU-UHW fail in light of the plausibility requirement established by *Twombly* and *Iqbal*.  (Dkt. No. 49-1 at 20–24.)  Prime responds that its allegations support the plausibility of its central assertion that Harris's conditional approval of the DCHS acquisition was motivated by political corruption.  (Dkt. No. 27 at 23–26.)

Prime alleges conclusorily that Harris entered into an illegal scheme with the SEIU-UHW: in exchange for SEIU-UHW's political support and provision of up to $25 million in contributions to her campaign, Harris agreed to prevent Prime from acquiring nonprofit hospitals in California until Prime agreed to allow SEIU-UHW to unionize its hospital workers.  (FAC ¶¶ 1, 41, 93.)  The "conclusory nature of [Plaintiffs'] allegations . . . disentitles them to the presumption of truth."  *Iqbal*, 556 U.S. at 681.  Moreover, as

---

[14] Prime maintains that its claims "are <u>not</u> *dependent*" on whether Prime can properly plead the existence of a bribery scheme between SEIU-UHW and Harris.  (Dkt. No. 27 at 26 n.3) (emphasis in original). Even if Prime's *quid pro quo* allegations in fact suffice under *Twombly* and *Iqbal*, the Court still finds it appropriate to dismiss Prime's FAC.  As explained further in this Order, Prime lacks a cognizable liberty or property interest under the Fourteenth Amendment, rendering it unable to pursue its substantive due process claim and its procedural due process challenge to the Nonprofit Hospital Transfer Statute's constitutionality; Prime does not allege that it was similarly situated to other for-profit acquirers of nonprofit hospitals for purposes of Prime's class-of-one equal protection claim; controlling law bars subjective inquiry into officials' underlying motives for purposes of determining whether NLRA preemption applies; and the Statute is not void for vagueness in all of its applications or as applied to Prime.

explained below, even were it not conclusory, Prime's core allegation of an illegal

agreement is contradicted by the nonconclusory factual allegations of the FAC.

Prime's nonconclusory factual allegations do not give rise to a "plausible

suggestion of conspiracy." *Twombly*, 550 U.S. at 565–66.  Notably, Prime's allegations

center on conduct by SEIU-UHW and its representatives.  (Dkt. No. 27 at 24–25.)  While

the allegations show that SEIU-UHW and its representatives attempted to pressure Prime

into accepting its unionization demands and mounted campaigns to block Prime's

hospital acquisitions, they do not allow the Court to draw a reasonable inference of

misconduct on Harris's part.  That the union told Prime during labor negotiations that it

has control over Harris and significant political influence in California does not overcome

the "obvious alternative explanation" that the union, which has been engaged in nearly a

decade of legal, political, and legal disputes with Prime, was attempting to gain leverage

over Prime and compel Prime to accede to its unionization demands.  *Twombly*, 550 U.S.

at 567.  Given that unions participate in the political arena, SEIU-UHW's

communications with Harris and donations to Harris's 2010 and 2014 campaigns for

Attorney General do not plausibly suggest an illegal agreement between Harris and

SEIU-UHW.  (FAC ¶¶ 9, 40.)

To the extent that there was an agreement for Harris to reject Prime's DCHS

acquisition in exchange for $25 million, the existence of such an incentivizing scheme is

at odds with SEIU-UHW's marked efforts to oppose Prime's acquisition.  Assuming that

Harris had in fact entered into a *quid pro quo* scheme with the union, there would have

been no need at all for SEIU-UHW's extensive actions, which included, *inter alia*,

creating a website to oppose Prime's bid (*id.* ¶ 68), airing television ads (*id.* ¶ 79),

initiating a calling campaign urging Harris to deny consent to the sale (*id.*), passing a

resolution calling on Harris to halt the sale of any hospital to Prime until investigations of

Prime for alleged Medicare fraud were resolved (*id.* ¶ 73), issuing a press release

announcing that twenty-seven state legislators had submitted a letter to Harris asking her

to stop the sale to Prime (*id.* ¶ 74), and issuing a subsequent announcement that thirty-

eight state legislators, two U.S. representatives, and other elected officials had signed on to the letter to Harris (*id.*). Rather than shoring up the existence of an illegal agreement between Harris and SEIU-UHW, these allegations point to the opposite conclusion. Despite Regan's puffing that he "control[s] Harris and the political process in California," (*id.* ¶ 85), SEIU-UHW's multifaceted campaign against Prime's acquisition belies Regan's boasts.

Moreover, that Harris personally requested that the ten-year conditions be inserted into the impact statements and into her final decision does not give rise to a plausible inference of an unlawful scheme or corrupt motive on her part. The "obvious alternative explanation" is that Harris was exercising her discretion pursuant to the Statute. *Twombly*, 550 U.S. at 567. The Statute and its corresponding regulations explicitly give Harris discretion to vary from her policy of requesting that essential services be continued for a minimum of five years. Even if Harris's discretionary decision to impose ten-year conditions on Prime constituted unsound or careless policymaking, the alleged lack of wisdom and care in issuing her decision would not plausibly establish that Harris had an improper purpose of carrying out an illegal agreement with the SEIU-UHW.

Finally, Prime's allegations that link Harris's conduct with politically corrupt motives are made upon information and belief.[15] (*See, e.g.*, FAC ¶¶ 17, 41, 47, 48, 53, 54, 56, 61, 85, 93, 102, 103, 105.) Because these allegations are conclusory, they are insufficient under *Twombly* and *Iqbal*. *See Blantz v. California Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs.*, 727 F.3d 917, 926–27 (9th Cir. 2013) (rejecting

---

[15] The Court rejects Prime's request for an opportunity to conduct limited discovery on whether a *quid pro quo* scheme existed. (Dkt. No. 27 at 26 n.3.) Prime cites *Menard v. CSX Transp., Inc.*, 698 F.3d 40 (1st Cir. 2012). In *Menard*, the plaintiff alleged "upon information and belief, employees and/or agents of [the railroad] knew that [the plaintiff] had been injured by the rail switch and had sufficient time to take action to prevent further injury to him." 698 F.3d at 44. The First Circuit held that "[w]here modest discovery may provide the missing link, the district court has discretion to allow limited discovery and, if justified, a final amendment of the complaint." *Id.* at 45. Here, unlike in *Menard*, the scope of Prime's discovery request far exceeds the "modest discovery" envisioned by the First Circuit.

plaintiff's complaint as conclusory and insufficient to state a claim against defendant because "[t]he only allegations that mention [defendant] are that, 'on information and belief,' he 'direct[ed]' the other defendants to take the actions that form the basis of the complaint"). The Supreme Court's reasoning in *Twombly* is illustrative. The complaint in *Twombly* presented its "ultimate allegations" on information and belief. *Twombly*, 550 U.S. at 551. Citing the defendants' "parallel course of conduct," the plaintiffs alleged "upon information and belief" that the defendants had "entered into a contract, combination or conspiracy" in violation of the antitrust laws. *Id.* The Supreme Court held that the plaintiffs had "not nudged their claims across the line from conceivable to plausible," and accordingly, "their complaint must be dismissed." *Twombly*, 550 U.S. at 547.

The Second Circuit explained *Twombly*'s impact on pleading upon information and belief:

> Because the *Twombly* complaint's factual allegations described only actions that were parallel, and were doctrinally consistent with lawful conduct, the conclusory allegation on information and belief that the observed conduct was the product of an unlawful agreement was insufficient to make the claim plausible. The *Twombly* plausibility standard, which applies to all civil actions, does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible.

*Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (internal citations and quotation marks omitted). Prime argues that "[w]hether AG Harris did in fact accept the promise of campaign contributions is a fact peculiarly within her possession and control, as Prime obviously was not present at the meetings or discussions between her and SEIU/Regan." (Dkt. No. 27 at 26.) However, because Prime's core allegation of an illegal agreement between the SEIU-UHW and Harris is conclusory, Prime's allegations on information and belief that reiterate this conclusion do not render such a scheme plausible. Like the plaintiffs' complaint in *Twombly*, Prime's factual allegations describe only actions by SEIU-UHW and Harris that were nominally parallel at best and were

"doctrinally consistent with lawful conduct." *Arista Records, LLC*, 604 F.3d at 120. Furthermore, the very specificity of Prime's allegation—that Harris accepted $25 million in campaign contributions—combined with the fact that Prime does not attribute its knowledge to any source or reasoning, undercuts Prime's argument that such information is peculiarly within Harris's control.  Moreover, Prime's belief is not "based on factual information that makes the inference of culpability plausible." *Id.*  In fact, as explained earlier, Prime's factual allegations regarding SEIU-UHW's conduct render the scheme implausible—they belie the conclusion that Harris had an agreement with SEIU-UHW to *de facto* deny approval of the DCHS sale in exchange for $25 million.  Accordingly, Prime's remaining "conclusory allegation[s] on information and belief that the observed conduct was the product of an unlawful agreement [are] insufficient to make the claim plausible." *Id.*

In sum, Prime's complaint has not "nudged [its] claims" of an illegal *quid pro quo* scheme between Harris and SEIU-UHW "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

## III.   42 U.S.C. § 1983 Claims

### A. Substantive Due Process

Defendant contends that Prime does not possess either a liberty or property interest protected by the Fourteenth Amendment.  (Dkt. No. 49-1 at 27–28.)  Defendant argues that accordingly, Prime does not meet the threshold requirement to state a due process claim under the Fourteenth Amendment.  (*Id.*)

"A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution." *Wedges/Ledges of California, Inc.*, 24 F.3d at 62.  Only a "limited range of rights . . . have been recognized as 'fundamental' for the purposes of substantive due process analysis[.]" *United States v. Juvenile Male*, 670 F.3d 999, 1013 (9th Cir. 2012).

/ / / /

20

### i.  Liberty Interest

#### a.  Liberty of Contract

Prime alleges that it has a "liberty interest in freedom from arbitrary government action."  (FAC ¶ 107.)  In response to Defendant's contention that Prime lacks a cognizable liberty interest, Prime cites to language in cases stating that the right to contract is a constitutionally protected liberty interest.  (Dkt. No. 27 at 29–30) (citing *Bayside Fish Flour Co. v. Gentry*, 297 U.S. 422, 427 (1936) and *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)).  Both *Bayside Fish Flour Co.* and *Meyer* rely on *Adkins v. Children's Hosp. of the D.C.*, 261 U.S. 525 (1923), in stating that the right to contract falls within the protection of the Due Process Clause.  *See* 297 U.S. at 427; 262 U.S. at 399.  However, in *West Coast Hotel Co. v. Parrish*, 300 U.S. 379 (1937), the Supreme Court repudiated the *Lochner v. New York*, 198 U.S. 45 (1905), and *Adkins* line of cases that upheld the liberty of contract as an interest protected by substantive due process.  *See* 300 U.S. at 400.  Accordingly, Prime's argument that it had a protected liberty interest on liberty of contract grounds fails.

#### b.  Occupational Liberty

Prime contends that Harris's actions violated its liberty right to pursue an occupation under the Fourteenth Amendment.  (Dkt. No. 27 at 29–30.)  Forecasting that the Attorney General will likewise reject or *de facto* deny any future nonprofit hospital acquisitions that Prime undertakes, Prime argues that "Harris's actions have resulted in a *de facto* debarment of Prime from contracting to purchase nonprofit hospitals in California."  (*Id.*)

The Supreme Court has stated that while there is "some generalized due process right to choose one's field of private employment," the cases recognizing such a right "all deal with a complete prohibition of the right to engage in a calling[.]"  *Conn v. Gabbert*, 526 U.S. 286, 291–92 (1999); *accord Guzman v. Shewry*, 552 F.3d 941, 954 (9th Cir. 2009) ("[T]he liberty interest in pursuing one's chosen profession has been recognized only in cases where (1) a plaintiff challenges the rationality of government regulations on

entry into a particular profession, or (2) a state seeks permanently to bar an individual from public employment."). To assert a substantive due process claim based on the right to pursue an occupation of one's choice, Plaintiffs must show "first, that they are unable to pursue an occupation in [their line of] business and, second, that this inability is due to actions that substantively were 'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.'" *Wedges/Ledges of California, Inc.*, 24 F.3d at 65 (quoting *FDIC v. Henderson*, 940 F.2d 465, 474 (9th Cir. 1991)).

Here, Prime has not alleged that it is unable to pursue an occupation in its chosen industry: owning and operating hospitals. (FAC ¶¶ 21–23.) Prime's FAC points to the opposite—Prime owns hospitals throughout the United States and has been billed an "award winning healthcare system." (*Id.*) That Harris conditionally approved Prime's DCHS acquisition does not leave Prime unable to continue purchasing, owning, and operating nonprofit and for-profit hospitals. *See, e.g.*, *Henderson*, 940 F.2d at 474 (holding that a former bank president who alleged that he was wrongfully discharged as a result of the actions of a state banking official must show that the acts left him "unable to pursue a job *in the banking profession*") (emphasis added).

Nor do Prime's citations to *de facto* debarment cases avail Prime's occupational liberty claim. (Dkt. No. 27 at 29–30.) "*De facto* debarment occurs when a contractor has, for all practical purposes, been suspended or blacklisted from working with a government agency without due process, namely, adequate notice and a meaningful hearing." *Phillips v. Mabus*, 894 F. Supp. 2d 71, 81 (D.D.C. 2012); *accord TLT Const. Corp. v. United States*, 50 Fed. Cl. 212, 215 (2001). The *de facto* debarment cases are factually inapposite to Prime's case.[16] Prime is in the business of owning and operating

---

[16] To the extent the *de facto* debarment cases are relevant, courts have established a high bar for such claims. Plaintiffs "must demonstrate a 'systematic effort by the procuring agency to reject all of the bidder's contract bids.'" *TLT Const. Corp. v. United States*, 50 Fed. Cl. 212, 215 (2001) (quoting *Stapp Towing, Inc. v. United States*, 34 Fed. Cl. 300, 312 (1995)). Plaintiffs may establish this "1) by an

hospitals, not government contracting, and Harris's conditional consent to Prime's proposed acquisition of DCHS does not deprive Prime of its ability to pursue its occupation.

Finally, Prime contends that Harris's actions amount to "government stigmatization" preventing Prime from pursuing its chosen occupation. (Dkt. No. 27 at 30–31.) However, "[o]nly the stigma of dishonesty or moral turpitude gives rise to a liberty interest[.]" *Henderson*, 940 F.2d at 477. Harris's decision regarding Prime's acquisition cannot be said to "impugn [Prime's] morality or question [Prime's] honesty." *Id.*

Accordingly, Plaintiffs do not allege that they possess a liberty interest protected by the Fourteenth Amendment.

### ii. Property Interest

To have a property interest in a government benefit, a person must have "a legitimate claim of entitlement to it.'" *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)). A property interest must "stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* "[S]tate law creates a 'legitimate claim of entitlement' when it 'imposes significant limitations on the discretion of the decision maker.'" *Gerhart v. Lake Cty., Mont.*, 637 F.3d 1013, 1019 (9th Cir. 2011) (quoting *Braswell v. Shoreline Fire Dep't*, 622 F.3d 1099, 1102 (9th Cir. 2010)); *see also Doyle v. City of Medford*, 606 F.3d 667, 673–74 (9th Cir. 2010) (citing cases holding that "a statute may create a property interest if it mandates a benefit when specific non-discretionary factual criteria are met"). "[A] benefit is not a protected entitlement if government officials may

---

agency's statement that it will not award the contractor future contracts; or 2) by an agency's conduct demonstrating that it will not award the contractor future contracts." *Id.* at 216. Prime does not allege a statement by the Attorney General indicating that all future acquisitions by Prime will be denied. Harris's conditional approval of Prime's DCHS acquisition does not rise to the level of conduct demonstrating that the Attorney General will not consent to Prime's future acquisitions.

grant or deny it in their discretion." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005).

"Whether an expectation of entitlement is sufficient to create a property interest will depend largely upon the extent to which the statute contains mandatory language that restricts the discretion of the decisionmaker."[17]  *Doyle*, 606 F.3d at 672–73 (quoting *Allen v. City of Beverly Hills*, 911 F.2d 367, 370 (9th Cir. 1990)).  "[A] statute must contain 'particularized standards or criteria' to create a property interest."  *Id.* at 673 (quoting *Allen*, 911 F.2d at 370) (internal quotation marks omitted).  Open-ended criteria, such as ones that look to "other factors of public interest," are not "particularized standards."  *Id.* at 673–74 (quoting *Shanks v. Dressel*, 540 F.3d 1082, 1091 (9th Cir. 2008)).  "Only if the governing statute compels a result 'upon compliance with certain criteria, none of which involve the exercise of discretion by the reviewing body,' does it create a constitutionally protected property interest."  *Shanks*, 540 F.3d at 1091 (quoting *Thornton v. City of St. Helens*, 425 F.3d 1158, 1164–65 (9th Cir. 2005)).

Defendant argues that Prime had no legitimate claim of entitlement because the Nonprofit Hospital Transfer Statute confers upon the Attorney General discretion to deny, consent to, or conditionally approve a transaction.  (Dkt. No. 49-1 at 28.)  In making her determination, "the Attorney General shall consider any factors that the Attorney General deems relevant, including, but not limited to, whether any of the [listed factors] apply."  Cal. Corp. Code § 5917.  The corresponding regulations allow the Attorney General "complete discretion" to determine the length of time the acquirer should continue existing levels of healthcare services.  Cal. Code Regs. tit 11, § 999.5(f)(8)(C) (emphasis added).  Given the discretion afforded by the Statute to the

---

[17] Prime cites *Walz v. Town of Smithtown*, 46 F.3d 162 (2d Cir. 1995), for the proposition that "governmental denial of permits and licenses for improper political or financial motives has been expressly held to violate substantive due process."  (Dkt. No. 27 at 42–43.)  However, in *Walz*, the Second Circuit found that plaintiffs met the threshold requirement of possessing a property interest in obtaining a permit.  *See* 46 F.3d at 168.  The court found that the discretion to deny plaintiffs a permit was "so circumscribed" that plaintiffs had an entitlement to the permit.  *Id.*

Attorney General in making her determination, state law does not confer upon Prime a legitimate claim of entitlement sufficient to be a cognizable property interest under the Fourteenth Amendment.

Prime cites to *Dominion Cogen, D.C., Inc. v. D.C.*, 878 F. Supp. 258 (D.D.C. 1995), for the proposition that "[t]he withholding of a permit that was necessary for the parties' contract to come to fruition 'as a result of improper and politically motivated conduct . . . more than satisfies' the standard for stating a due process claim.'" (Dkt. No. 27 at 27–28) (quoting *Dominion Cogen*, 878 F. Supp. at 265). In *Dominion Cogen*, the plaintiffs contended that they had complied with all necessary regulatory requirements and that "the only thing left to be done was for the Department of Consumer and Regulatory Affairs ("DCRA") to issue building permits for the project." 878 F. Supp. at 261. The court stated that "the narrow question presented by this case is whether plaintiffs were improperly denied building permits to which they were legally entitled, and which District officials had extremely limited discretion to withhold." *Id.* at 267. Here, Prime has not alleged that it was "legally entitled" to the Attorney General's approval of the transaction or that the Attorney General had extremely limited discretion.

Citing decisions holding that individuals who were terminable only for cause had property interests in their continued employment, Prime contends that its private contract with DCHS created a property interest cognizable under the Fourteenth Amendment.[18]

---

[18] In *Stein v. Bd. of City of New York, Bureau of Pupil Transp.*, 792 F.2d 13 (2d Cir. 1986), the Second Circuit found that Stein had a protected property interest in continued employment because his private employer's contract with the state provided that he could be terminated only for "good cause." 792 F.2d at 17. In *Greene v. McElroy*, 360 U.S. 474 (1959), the Supreme Court held that the federal government could not revoke petitioner's security clearance—and thus cause him to lose his job because his security clearance was a job requirement—without procedural due process. *See* 360 U.S. at 508. In *Merritt*, the Ninth Circuit found that Merritt had a protected property interest in his continued employment because he was terminable only for cause. *See* 827 F.2d at 1371. Accordingly, government officials who pressured Merritt's private employer to terminate him without a hearing deprived him of property without due process. *See id.* at 1372. Other cases Prime cites are also inapposite. *See Lynch v. United States*, 292 U.S. 571, 576 (1934) (holding that the government could not avoid its commitment to pay disability and life insurance by enacting a statute repealing the laws granting the benefit without committing a constitutional taking under the Fifth Amendment); *In re Marriage of Skaden*, 566 P.2d 249

3:16-cv-00778-GPC-RBB

(Dkt. No. 27 at 27–28.)  While these cases involved situations wherein the government's actions affected individuals' property interests in private contracts, they are factually inapposite.[19]  Although its contract with DCHS was an acquisition contract, not an employment contract, Prime argues that because the contract provided that termination of the contract for an unenumerated reason would result in liquidated damages, the contract was analogously terminable only for good cause.  (Dkt. No. 27 at 28.)  Prime cites no law in support of its analogy.  To the extent that Prime's contract with DCHS can be analogized to a for-cause employment contract, the terms of the sale contract render the analogy moot.  (Def.'s RJN I, Ex. 12 at 49–53.)  The sale contract allowed for termination for "any reason" by Prime or DCHS, and the contract was expressly conditioned upon approval by the Attorney General and subject to conditions she might impose.  *Id.*; *see Roth*, 408 U.S. at 578 (holding that an at-will college professor had no property interest in his job within the meaning of the Fourteenth Amendment); *Benn v. Cty. of Los Angeles*, 58 Cal. Rptr. 3d 563, 572 (Cal. Ct. App. 2007) (finding that the "mere inclusion of the 'termination for convenience' clause in the contracts eliminated the essential characteristic of permanence and entitlement necessary to a finding of a protectable property right").

Finally, Prime argues that it possessed a property interest in the contract because the DCHS sale agreement was structured on the parties' prediction that Harris would continue imposing five-year, as opposed to ten-year, service continuance requirements.

---

(Cal. 1977) (holding that a husband's employment termination benefits under an agency agreement with an insurance company constituted a divisible property right).

[19] To the extent that Prime bases its due process claim on Harris's alleged interference with its contract with DCHS, the Ninth Circuit has cautioned that "substantive due process is not a 'font of tort law' that superintends all official decision making."  *Shanks*, 540 F.3d at 1089.  While "deprivation of contractual rights may create a claim under section 1983," there is an "an equally compelling necessity to recognize that not *every* interference with contractual expectations does so."  *San Bernardino Physicians' Servs. Med. Grp., Inc. v. San Bernardino Cty.*, 825 F.2d 1404, 1408 (9th Cir. 1987).  "[T]he Fourteenth Amendment was not intended to shift the whole of the public law of the states into the federal courts."  *Brown v. Brienen*, 722 F.2d 360, 364 (7th Cir. 1983).

(Dkt. No. 27 at 28–29.)  However, a "constitutional entitlement cannot be created—as if by estoppel—merely because a wholly and *expressly* discretionary state privilege has been granted generously in the past."  *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465 (1981) (internal citation and quotation marks omitted); *Gerhart*, 637 F.3d at 1021 ("[A] government body's past practice of granting a government benefit is insufficient to establish a legal entitlement to the benefit.").  Nor did Prime have a "mutually explicit" understanding that would give rise to an entitlement to the Attorney General's consent to the DCHS acquisition on terms Prime desired.  *Roth*, 408 U.S. at 577; *see also Orloff v. Cleland*, 708 F.2d 372, 377 (9th Cir. 1983) (remanding the question of whether plaintiff's twenty years of employment by the Veterans Administration ("VA") and an "indefinite extension" of plaintiff's appointment after the initial termination decision created a "mutually explicit" understanding with the VA that plaintiff had a property interest in his employment); *Gerhart*, 637 F.3d at 1020 ("A person's belief of entitlement to a government benefit, no matter how sincerely or reasonably held, does not create a property right if that belief is not mutually held by the government.").

For the foregoing reasons, Plaintiffs do not allege that they possess a property interest protected by the Fourteenth Amendment.  Accordingly, Plaintiffs cannot state a § 1983 claim for violation of their due process rights under the Fourteenth Amendment.

### B. Equal Protection

Plaintiffs allege that Harris violated their Fourteenth Amendment equal protection rights by "not us[ing] the same standard of review and approval that she used with other similarly situated buyers of non-profit hospitals, but instead us[ing] a different standard that imposed arbitrary, capricious, onerous and unprecedented approval conditions because Plaintiffs rejected UHW's unionization demands, an impermissible standard[.]" (FAC ¶ 113.)  Because Plaintiffs do not allege that they are members of a class, Plaintiffs allege a "class-of-one" claim.  To state a valid "class-of-one" claim under the Equal Protection Clause, Plaintiffs must allege that they have "been intentionally treated differently from others similarly situated and that there is no rational basis for the

1    difference in treatment." *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 601 (2008)

2    (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

3         Defendant contends that the class-of-one theory is not applicable in this case

4    because Defendant's actions constituted discretionary state decisionmaking.  (Dkt. No.

5    49-1 at 29.)  In *Towery v. Brewer*, 672 F.3d 650 (9th Cir. 2012), the Ninth Circuit stated

6    that "[t]he class-of-one doctrine does not apply to forms of state action that 'by their

7    nature involve discretionary decisionmaking based on a vast array of subjective,

8    individualized assessments.'"  672 F.3d at 660 (quoting *Engquist v. Oregon Dep't of*

9    *Agric.*, 553 U.S. 591, 603 (2008)).  While Defendant is correct in arguing that her

10   conditional approval of Prime's DCHS acquisition was the product of discretionary

11   decisionmaking, the Ninth Circuit noted in *Towery* that the class-of-one theory is

12   inapplicable only "[a]bsent any pattern of generally exercising the discretion in a

13   particular manner while treating one individual differently *and* detrimentally."  *Id.* at

14   660–61 (emphasis in original).  To the extent that Prime alleges that Harris had a pattern

15   of exercising her discretion in a particular manner while treating Prime differently and

16   detrimentally, the Court declines at this time to hold that the class-of-one theory is

17   inapplicable here.

18        **1.  "Similarly Situated"**

19        Defendant contends that Prime fails to allege facts showing that it was similarly

20   situated to other buyers of nonprofit hospitals.  (Dkt. No. 49-1 at 29–30.)  Prime lists a

21   number of acquired nonprofit hospitals and corresponding conditions that the Attorney

22   General imposed on those transactions.  (FAC ¶¶ 96–97.)  The conditions imposed vary

23   from transaction to transaction.  (*Id.*)  However, Prime does not allege anything about the

24   *buyers* that could give rise to an inference that such buyers were similarly situated as

25   Prime.  (*Id.*)  If anything, Prime's FAC indicates that no other similarly situated

26   comparator exists, as Prime was slated to be the buyer in "the single largest hospital

27   transaction ever reviewed by the Attorney General's office."  (*Id.* ¶¶ 8, 9.)  Prime attaches

28   two transactions in its Request for Judicial Notice.  (Pls.' RJN, Ex. A–B.)  One involved

a for-profit buyer's proposed acquisition of a single hospital.  (Pls.' RJN, Ex. A at 5.)
The other involved an agreement between two nonprofit entities.  (Pls.' RJN, Ex. B at 5.)
Neither transaction aids Prime's showing of a similarly situated comparator.
Accordingly, Prime's class-of-one claim fails for lack of a similarly situated comparator.
*C.f. Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) ("[The Equal Protection Clause] keeps
governmental decisionmakers from treating differently persons who are in all relevant
respects alike."); *Erickson v. Cty. of Nevada ex rel. Bd. of Supervisors*, 607 F. App'x 711,
712 (9th Cir. 2015) ("Parties allegedly treated differently in violation of the Equal
Protection Clause are similarly situated only when they are 'arguably indistinguishable.'"
(quoting *Engquist*, 553 U.S. at 601)); *Gerhart*, 637 F.3d at 1022 (finding that plaintiff
"presented considerable evidence that he was treated differently than other similarly
situated property owners throughout the permit application process," given his
"uncontradicted testimony" that "at least ten other property owners on his block" had
built lane approaches without being required to apply for an approach permit).

Prime cites to decisions that purportedly allowed class-of-one claims to proceed if
the state actor was shown to have selectively enforced the law because of animus,
regardless of whether the plaintiffs made a sufficient showing of the "similarly situated"
element.  (Dkt. No. 27 at 33–34) (citing *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d
936, 945–47 (9th Cir. 2004); *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir.
2013)).  Contrary to Prime's contention, a finding of pretext on Defendants' part affects
the "rational basis" element of a class-of-one claim, not the "similarly situated" element.
*See Squaw Valley Dev. Co.*, 375 F.3d at 945–46 ("In this circuit it is clearly established
that a plaintiff may pursue an equal protection claim by raising a 'triable issue of fact as
to whether the defendants' asserted [rational basis] . . . was merely a pretext' for
differential treatment." (internal citation omitted, alteration in original)).  Although the
plaintiff in *Squaw Valley* asserted a class-of-one claim without presenting evidence of
other similarly situated entities, *see id.* at 945, the Ninth Circuit subsequently clarified
that the similarly situated prong was not raised or contested on summary judgment, and

that the defendant had conceded for purposes of appeal that plaintiff was subject to more oversight and regulatory and enforcement action as compared to other similarly situated parties, *see Squaw Valley Dev. Co. v. Goldberg*, 395 F.3d 1062, 1063–64 (9th Cir. 2005) (denying petition for rehearing or rehearing en banc).  The Ninth Circuit emphasized that its statement about the lack of an "apples to apples" comparison of similarly situated entities "was made in the context of demonstrating that the record supports that [the defendant] had a rational basis for his exceptionally close scrutiny and oversight of [the plaintiff]." *Id.* at 1063.

Swanson is likewise inapposite.  In *Swanson*, the Seventh Circuit stated that "[i]f animus is readily obvious, it seems redundant to require that the plaintiff show disparate treatment in a near exact, one-to-one comparison to another individual."  718 F.3d at 784 (citing *Fenje v. Feld*, 398 F.3d 620, 628 (7th Cir. 2005) ("[A]n 'orchestrated campaign of official harassment directed against [the plaintiff] out of sheer malice,' 'vindictiveness,' or 'malignant animosity' would state a claim for relief under the Equal Protection Clause." (internal citation omitted)).  Here, Plaintiff has not alleged "readily obvious" animus on Harris's part.

## 2. Rational Basis

"[T]he rational basis prong of a 'class of one' claim turns on whether there is a rational basis for the *distinction*, rather than the underlying government *action*." *Gerhart*, 637 F.3d at 1023 (emphasis in original).  "Unless a classification trammels fundamental personal rights or implicates a suspect classification, to meet constitutional challenge the law in question needs only some rational relation to a legitimate state interest." *Lockary v. Kayfetz*, 917 F.2d 1150, 1155 (9th Cir. 1990).  The court determines whether there is "any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993).

Prime argues that the burden of rational basis review applies only in an equal protection challenge to a legislative classification in a statute.  (Dkt. No. 27 at 35.)  The Ninth Circuit rejected this argument in *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580 (9th

30

1  Cir. 2008).  In *Lazy Y Ranch*, the appellant made the same argument, drawing on the

2  distinction between legislative and executive decisionmaking.  *See* 546 F.3d at 590 n.4.

3  The Ninth Circuit stated that the same equal protection analysis "applies equally to

4  executive and legislative action."  *Id.* (citing *Nordlinger v. Hahn*, 505 U.S. 1, 16 n.8

5  (1992); *Immigrant Assistance Project of L.A. County Fed'n of Labor v. INS*, 306 F.3d

6  842, 872 (9th Cir. 2002)).

7       Even if Prime presented sufficient allegations of similarly situated comparators, the

8  Attorney General had a rational basis for imposing different conditions on Prime.  Prime

9  contends that Harris did not proffer any reasoned explanation for the conditions she

10  imposed in her final decision.  (Dkt. No. 27 at 36–37.)  However, the Nonprofit Hospital

11  Transfer Statute does not require the Attorney General to provide reasons for her

12  decision, and Prime cites no legal authority requiring that Harris proffer reasons for her

13  final decision.  The Attorney General has discretion to consider whether each individual

14  transaction "may create a significant effect on the availability or accessibility of health

15  care services to the affected community" and whether the transaction is "in the public

16  interest."  Cal. Corp. Code § 5917.  Requiring Prime to continue services for ten years

17  ensures that the hospitals will continue to provide services to their communities.  (Dkt.

18  No. 49-1 at 31.)

19            **a. Pretext**

20       A plaintiff may overcome a defendant's alleged rational basis by demonstrating

21  pretext.  "[A]cts that are malicious, irrational, or plainly arbitrary do not have a rational

22  basis."  *Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985, 993 (9th Cir. 2007), *aff'd sub*

23  *nom. Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591 (2008).  "[I]n an equal protection

24  claim based on selective enforcement of the law, a plaintiff can show that a defendant's

25  alleged rational basis for his acts is a pretext for an impermissible motive."  *Id.*  An equal

26  protection plaintiff may show pretext by showing that "(1) the proffered rational basis

27  was objectively false; or (2) the defendant actually acted based on an improper motive."

28  *Squaw Valley Dev. Co.*, 375 F.3d at 946–47.

1   Prime does not show that Harris's "preferred rational basis was objectively false."

2   *Id.*  As explained earlier, Prime's allegations that Harris was motivated by an illegal

3   scheme with the SEIU-UHW are conclusory at best.  And Prime's factual allegations do

4   not raise a plausible inference of an illegal *quid pro quo* scheme between SEIU-UHW

5   and Harris.  Because Prime's *quid pro quo* allegations do not pass muster under the

6   *Twombly* and *Iqbal* plausibility standard, Prime does not show that Harris's alleged

7   rational basis for her acts was a pretext for an impermissible motive.

8   Accordingly, Plaintiffs fail to state a § 1983 claim for violation of their equal

9   protection rights under the Fourteenth Amendment.

10   **C. National Labor Relations Act ("NLRA")**

11   Prime alleges that Harris's *de facto* denial of the DCHS acquisition and refusal to

12   approve the transaction unless Prime agreed to SEIU-UHW's unionization demands

13   interfered with its right to collectively bargain with SEIU-UHW free of government

14   interference.  (FAC ¶¶ 117–20.)  Defendant contends that the ten-year conditions do not

15   regulate or interfere with the collective bargaining process at all.  (Dkt. No. 49-1 at 32–

16   34.)  Even if the conditions did implicate the collective bargaining process, Defendant

17   asserts that the NLRA does not preempt state action where the Attorney General is acting

18   in *parens patriae* on behalf of members of the public affected by the DCHS sale.[20]  (*Id.* at

19   34–35.)

20   Section 8(d) of the NLRA imposes duties on "employers, employees, and labor

21   organizations" regarding the obligation to bargain collectively.  29 U.S.C. § 158(d).  By

22   its terms, § 8(d) does not apply to state action.  Accordingly, state action that affects

23   collective bargaining ordinarily will not violate the NLRA.  *See Golden State Transit*

24   *Corp. v. City of Los Angeles*, 493 U.S. 103, 105 n.2 (1989) ("*Golden State II*").

25

26

27   [20] Because the Court finds that Prime does not state a § 1983 claim for violation of its NLRA rights, the
Court declines to dismiss Prime's claim on the basis that the Attorney General's actions in *parens*

28   *patriae* are not subject to NLRA preemption.

1    However, certain state action may be preempted by the NLRA and violate the NLRA.  *Id.*

2    at 110–13.  Under the *Machinists* preemption doctrine, a state is prohibited from

3    regulating conduct left "to be controlled by the free play of economic forces."  *Lodge 76,*

4    *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Wisconsin Employment*

5    *Relations Comm'n*, 427 U.S. 132, 140 (1976) (internal citation omitted).  *Machinists*

6    preemption is applicable to the instant case.  (FAC ¶¶ 117–19.)

7         Prime cites *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608 (1986)

8    ("*Golden State I*") to support its claim that Harris violated its rights under the NLRA.

9    (Dkt. No. 27 at 37–38.)  Defendant contends that *Golden State* is inapplicable because

10   Harris did not impose collective bargaining conditions on her conditional approval of the

11   DCHS transaction.  (Dkt. No. 49-1 at 33.)  In *Golden State I*, Golden State filed suit

12   against the city of Los Angeles, alleging that the city's denial of its franchise renewal was

13   preempted by the NLRA and violated its due process and equal protection rights.  *See*

14   475 U.S. at 611.  The district court found that it was "undisputed that the sole basis for

15   refusing to extend [Golden State's] franchise was its labor dispute with its Teamster

16   drivers," and that the City Council had "threaten[ed] to allow Yellow Cab's franchise to

17   terminate unless it entered into a collective bargaining agreement with the Teamsters."

18   *Id.* (internal citation omitted).  The district court found, in short, that the City Council had

19   expressly conditioned Golden State's franchise renewal on the settlement of the labor

20   dispute.  *Id.* at 615.  The Supreme Court concluded that the "city's insistence on a

21   settlement is pre-empted if the city [entered] into the substantive aspects of the

22   bargaining process to an extent Congress has not countenanced."  *Id.* at 615–16 (internal

23   citation omitted).  The Court held "only that a city cannot condition a franchise renewal

24   in a way that intrudes into the collective-bargaining process."  *Id.* at 619.

25        Here, none of the conditions Harris imposed on the transaction address Prime's

26   collective bargaining rights.  Prime's allegations that individuals in the Attorney

27   General's Office reported that the ten-year conditions were from Harris herself do not

28   show that Harris imposed a condition to unionize on Prime.  (FAC ¶ 15.)  At most, Prime

3:16-cv-00778-GPC-RBB

can only point to its allegations that purported friends of Harris, like DCHS lobbyist Conway Collis and former Attorney General and labor mediator William Lockyer, advised Prime during labor negotiations that it should accede to SEIU-UHW's demands to obtain approval from Harris.  (*Id.* ¶¶ 12–13.)  However, Prime alleges that Regan was the one who told Collis that Prime would not receive approval from Harris unless Prime conceded to SEIU-UHW.  (*Id.* ¶ 44.)  And to infer from these allegations an underlying motive for Harris's conditional approval of Prime's acquisition is beyond the scope of the Court's analysis of NLRA preemption.

    In determining whether NLRA preemption applies, a court does not conduct a subjective inquiry into the reasons for the action.  "Congress did not intend for the NLRA's . . . preemptive scope to turn on state officials' subjective reasons for adopting a regulation or agreement."  *Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1026 (9th Cir. 2010) (refusing to consider plaintiffs' argument that the community college district had "ulterior motives" to "reward the unions" that had supported a political campaign in deciding whether NLRA preemption applied); *see also Int'l Paper Co. v. Town of Jay*, 928 F.2d 480, 483–84 (1st Cir. 1991) (declining "to construe *Golden State* so broadly as to require inquiry . . . into the motives of the selectmen prior to the Board's drafting and proposing the Ordinance"); *c.f. N. Ill. Chapter of Associated Builders and Contractors, Inc. v. Lavin*, 431 F.3d 1004, 1007 (7th Cir. 2005) ("Federal preemption doctrine evaluates what legislation *does*, not why legislators voted for it or what political coalition led to its enactment." (emphasis in original)); *Bldg. Indus. Elec. Contractors Ass'n v. City of N.Y.*, 678 F.3d 184, 191 (2d Cir. 2012) (declining to "search for an impermissible motive where a permissible purpose is apparent").  In order to conclude that Harris imposed a condition to unionize on Prime, the Court necessarily reads beyond the face of Harris's decision, because her decision included nothing about

collective bargaining.[21]   Such an inquiry is irrelevant to considering whether NLRA preemption applies.

Prime also cites *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103 (1989) ("*Golden State II*") to argue that Defendant fails to meet her burden to show that Congress foreclosed a remedy under § 1983.  (Dkt. No. 27 at 38–39.)  Prime's argument is misplaced.  Here, Defendant moves to dismiss Plaintiffs' claim based on a lack of NLRA preemption and does not contest the availability of a § 1983 remedy for deprivation of a federally secured right under the NLRA.  (Dkt. No. 49-1 at 32–35.)

Accordingly, Plaintiffs fail to state a § 1983 claim for violation of their NLRA rights.

## IV.   Qualified Immunity

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  "[W]hether an official protected by qualified immunity

---

[21] Prime misconstrues the Ninth Circuit's discussion of *Wisconsin Dep't of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 283 (1986), in *Johnson*, 623 F.3d at 1025–26.  In *Gould*, the Supreme Court held that Wisconsin did not qualify for the "market participation" exception to NLRA preemption, because Wisconsin's statute that debarred individuals who had violated the NLRA three times within a five-year period from doing business with the state was tantamount to regulation—the state was not merely acting as a market participant.  *See* 475 U.S. at 289–91.  The Ninth Circuit in *Johnson* stated that *Gould* established that "where the state seeks to affect private parties' conduct unrelated to the performance of contractual obligations to the state, the state's direct participation in the market does not reflect its interest in 'efficient procurement' of goods and services."  623 F.3d at 1026.  Prime's case is readily distinguishable from *Gould*.  Unlike the regulation in *Gould*, "nothing on the face" of Harris's final decision "indicates that it serves purely regulatory purposes unrelated to the performance of contractual obligations to the state."  *Id.*  Nor is the market participation exception relevant in this case.

may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Grossman v. City of Portland*, 33 F.3d 1200, 1208 (9th Cir. 1994) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)) (internal citation omitted). "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal citation and quotation marks omitted).

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* (internal citation and quotation marks omitted). While there need not be a case "directly on point," "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (internal citation omitted). Importantly, courts should not "define clearly established law at a high level of generality." *Id.* (internal citation omitted). Rather, the "dispositive question is whether the violative nature of *particular* conduct is clearly established." *Id.* (internal citation and quotation marks omitted). "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (internal citation and quotation marks omitted).

As a threshold matter, the Court notes that the parties' briefing on the qualified immunity defense is relatively sparse. (Dkt. No. 49-1 at 38–40; Dkt. No. 27 at 41–44; Dkt. No. 31 at 28–30.) Neither party specifies beyond a high level of generality what constitutes the clearly established law at issue in the instant qualified immunity analysis. Nor do Plaintiffs' arguments establish how Defendant's acts lacked objective legal reasonableness in light of clearly established law. Instead, Plaintiffs assert that their FAC survives the qualified immunity defense by reiterating their claims and providing cursory analysis of how Defendant's conduct violates clearly established law. (Dkt. No. 27 at 41–44.)

Notwithstanding the above, the Court concludes that Defendant is entitled to the qualified immunity defense because Prime fails to state § 1983 claims for (1) violation of

1  its due process rights under the Fourteenth Amendment, (2) violation of its equal

2  protection rights under the Fourteenth Amendment, and (3) violation of its rights under

3  the NLRA.  Prime has not made a showing that Harris violated a statutory or

4  constitutional right and thus cannot meet its burden at step one of the qualified immunity

5  analysis.  *See Pearson*, 555 U.S. at 236.

6  **V.   Constitutionality of the Nonprofit Hospital Transfer Statute**

7          Prime seeks a declaratory judgment that the Nonprofit Hospital Transfer Statute is

8  facially unconstitutional and as applied to Prime.  (FAC ¶¶ 122–31.)  Prime also seeks

9  accompanying injunctive relief.  (*Id.* ¶¶ 132–36.)  While its FAC alleges that the Statute

10  is unconstitutional both under the California Constitution and under the Fourteenth

11  Amendment of the U.S. Constitution, Prime conceded in its opposition brief that it will

12  no longer pursue its claim that the Statute violates the California Constitution.  (Dkt. No.

13  27 at 44.)  Accordingly, Prime's two remaining bases for declaratory and injunctive relief

14  under the Fourteenth Amendment are that (1) the Statute is void for vagueness, and (2)

15  the Statute violates procedural due process.  (*Id.* at 44–48.)

16          **A. Facial Challenges**

17          "[F]acial challenges to legislation are generally disfavored[.]"  *FW/PBS, Inc. v.*

18  *City of Dallas*, 493 U.S. 215, 223 (1990), *holding modified by City of Littleton, Colo. v.*

19  *Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774 (2004); *accord Washington State Grange v.*

20  *Washington State Republican Party*, 552 U.S. 442, 450–51 (2008) (enumerating reasons

21  why facial challenges are disfavored).  The only way for a plaintiff to succeed in a facial

22  challenge is to establish that "no set of circumstances exists under which the Act would

23  be valid," meaning "that the law is unconstitutional in all of its applications."

24  *Washington State Grange*, 552 U.S. at 449; *see also IDK, Inc. v. Clark Cty.*, 836 F.2d

25  1185, 1198 (9th Cir. 1988) ("The absence of a significant first amendment interest is . . .

26  fatal to a facial challenge of a business regulation for vagueness unless the regulation is

27  vague in all possible applications."); *Vill. of Hoffman Estates v. Flipside, Hoffman*

28  *Estates, Inc.*, 455 U.S. 489, 497 (1982) ("[T]he complainant must demonstrate that the

law is impermissibly vague in all of its applications."). Based on the sparse briefing before the Court, the Court finds that Prime cannot meet its heavy burden to establish that the law is unconstitutional in all of its applications. *See Washington State Grange*, 552 U.S. at 449. Prime cannot succeed on either of its facial challenges to the Statute.

## B. Procedural Due Process As Applied to Prime

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "[T]he range of interests protected by procedural due process is not infinite." *Roth*, 408 U.S. at 569–70.

Prime does not sufficiently plead that it had a cognizable liberty interest or property interest protected by the Due Process Clause of the Fourteenth Amendment. The cases that Prime cites do not support its claim that it possessed a cognizable liberty or property interest. Moreover, Prime argues only cursorily that the Statute does not provide for adequate procedural safeguards. (Dkt. No. 27 at 47–48.) Instead, Prime mainly takes issue with the Statute's conferral of broad discretion upon the Attorney General to impose conditions on the transaction. (*Id.*; FAC ¶¶ 122–31.) Prime's as-applied procedural due process challenge to the Nonprofit Hospital Transfer Statute accordingly fails.

## C. Void for Vagueness As Applied to Prime

The void for vagueness doctrine addresses two due process concerns—fair notice and fair enforcement.[22] *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972);

---

[22] The Supreme Court stated, in relevant part:

It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards

*accord F.C.C. v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012) (citing *Grayned*, 408 U.S. at 108–109).  The relevant inquiry is whether the law is "'so vague and indefinite as really to be no rule or standard at all,' or whether a person of ordinary intelligence could understand" what the law requires.  *Fang Lin Ai v. United States*, 809 F.3d 503, 514 (9th Cir. 2015) (quoting *Boutilier v. Immigration & Naturalization Serv.*, 387 U.S. 118, 123 (1967)).  If a law "imposes neither regulation of nor sanction for conduct," then "no necessity exists for guidance so that one may avoid the applicability of the law."  *Boutilier*, 387 U.S. at 123.  Contrary to Defendant's contention, the void for vagueness doctrine is applicable to cases that involve civil penalties, not just criminal liability.  *See e.g.*, *F.C.C. v. Fox*, 132 S. Ct. at 2317–20; *Vill. of Hoffman Estates*, 455 U.S. at 499.

Here, Prime does not challenge the statute's regulation or sanctioning of its conduct—*i.e.*, that Prime could not understand what the statute requires of entities submitting transactions for the Attorney General's review, or that the statute is so vague and indefinite as to provide no standard at all for Prime's compliance with the law.  Rather, Prime is concerned with the fact that the statute confers upon the Attorney General discretion to consent to, deny, or conditionally approve transactions.  The void for vagueness doctrine is not an instrument for obtaining desirable results from discretionary decisionmaking.  *See Grayned*, 408 U.S. at 108–09.

Even if the void for vagueness doctrine applies as Prime argues, the statute is not impermissibly vague.  The vagueness inquiry is less strict in the civil context and where the law does not inhibit the exercise of constitutionally protected rights.  *See United States Telecom Ass'n v. F.C.C.*, 825 F.3d 674, 736 (D.C. Cir. 2016); *Vill. of Hoffman Estates*, 455 U.S. at 498–99.  "The degree of vagueness tolerated in a statute varies with

---

for those who apply them.  A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

*Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972).

its type: economic regulations are subject to a relaxed vagueness test, laws with criminal penalties to a stricter one, and laws that might infringe constitutional rights to the strictest of all." *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 186 (2d Cir. 2010) (internal citation and quotation marks omitted).  When a statute "is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts." *Id.* (internal citation and quotation marks omitted). Courts "apply the void-for-vagueness doctrine outside of the First Amendment context only rarely." *American Iron & Steel Inst. v. OSHA*, 182 F.3d 1261, 1277 (11th Cir. 1999).  "[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Powell*, 423 U.S. 87, 92 (1975) (quoting *United States v. Mazurie*, 419 U.S. 544, 550 (1975)).  Here, the statute and regulations at issue are not laws that infringe on First Amendment or other constitutional rights.[23]  Nor are they laws that yield criminal liability or civil penalties.  The vagueness that is tolerated in such a statute is thus subject to a relaxed standard.

Prime argues that open-ended criteria in the statute that allow the Attorney General to consider "any factors" that she deems "relevant," including a number of subjective factors like the "public interest," render the statute unconstitutionally vague.  (Dkt. No. 27 at 44–46.)  As a threshold matter, the statute does not confer upon the Attorney General boundless discretion, as Prime argues.  It specifies that the Attorney General

---

[23] Prime's citation to *Cable Alabama Corp. v. City of Huntsville, Ala.*, 768 F. Supp. 1484 (N.D. Ala. 1991), is inapposite because the case involved First Amendment rights and a heightened standard of review.  In *Cable Alabama Corp.*, a cable company claimed that the ordinance under which the city rejected its franchise transfer requests was unconstitutionally vague because it "provide[d] no specific standards or criteria for judging any petition for transfer of the franchise or change in control."  768 F. Supp. at 1504–05.  The court concluded that the presence of First Amendment concerns required the law to be voided if it was vague in any application.  *See id.*  Pursuant to this heightened standard of review, the court held that the law was unconstitutionally vague.  *See id.*  Here, no First Amendment or other constitutionally protected rights are at issue, and the Nonprofit Hospital Transfer Statute and its enabling regulations provide specific standards and criteria for evaluating proposed nonprofit hospital transactions.

"*shall* consider any factors that the Attorney General deems relevant, *including*, but not limited to," a list of nine factors specified by the Statute.  Cal. Corp. Code § 5917 (emphases added).  Moreover, the statute's enabling regulations supply definitions and guidelines for what the Attorney General shall and may consider in her review of the transaction.  *See* Cal. Code Regs. tit. 11, § 999.5(e)–(f).  That the Attorney General can consider the "public interest" does not render the statute vague.  *See, e.g.*, *Montgomery Nat. Bank v. Clarke*, 882 F.2d 87, 89–90 (3d Cir. 1989) (concluding that "public interest" was not void for vagueness and noting that the Supreme Court has "frequently upheld statutes that require administrative agencies to make determinations based upon standards such as the public interest").  Even in the criminal context, "a statute is not void for vagueness merely because it uses the word 'reasonable' or 'unreasonable.'"  *United States v. Krumrei*, 258 F.3d 535, 538 (6th Cir. 2001) (internal citation omitted).  In sum, that the Attorney General has discretion and may base her determination on subjective criteria does not render the statute void for vagueness.  *See Steel Inst. of N.Y. v. City of N.Y.*, 832 F. Supp. 2d 310, 336 (S.D.N.Y. 2011), *aff'd*, 716 F.3d 31 (2d Cir. 2013) (concluding that the lack of specific criteria for issuing temporary certificates of approval or operation for construction machinery "does not necessarily mean that the [Department of Buildings] has been given unconstrained discretion," because "[p]resumably, discretion would be guided by the purposes of the Building Code generally and the provisions of the City Statutes in particular"); *CMR D.N. Corp. v. City of Philadelphia*, 829 F. Supp. 2d 290, 301–02 (E.D. Pa. 2011), *aff'd*, 703 F.3d 612 (3d Cir. 2013) (rejecting plaintiffs' argument that a zoning ordinance was void for vagueness because it allowed for "impermissible discretion" and arbitrary application and contained subjective criteria such as "appropriate[ness]" for the "surrounding community"); *c.f. Leib v. Hillsborough Cty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1311 (11th Cir. 2009) ("[T]he Constitution does not require precision; all that is required is that the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding.").

Prime cites to *Wedgewood Ltd. P'ship I v. Twp. of Liberty, Ohio*, 578 F. Supp. 2d 941, 953 (S.D. Ohio 2008), *aff'd*, 610 F.3d 340 (6th Cir. 2010) (finding development plan invalid as applied to plaintiff because defendant's application of the scheme did not "put Plaintiff on adequate notice of prohibited conduct" and introduced requirements in denying plaintiff's application that a person of common intelligence would not have known of from reading the plan).  Prime alleges that Harris considered her "personal political career ambitions as a factor for requiring that Prime continue many non-essential healthcare services for up to ten years," and that nothing in the statute or regulations put Prime on notice that its acquisition "would be reviewed using these arbitrary criteria." (Dkt. No. 27 at 46.)

Prime's argument at its core challenges Harris's conduct and alleged abuse of discretion, not the vagueness of the Statute.  As a starting point, the Statute does not confer unbridled discretion upon the Attorney General.  *Wedgewood* is inapposite, as Prime does not allege that it lacked notice of what was required to comport with the Nonprofit Hospital Transfer Statute.  Setting plausibility aside, if Harris acted pursuant to an illegal agreement with the SEIU-UHW, her misconduct was not a product of the Statute's alleged vagueness.  Put another way, even had the statute substantially constrained the Attorney General's discretion, the purported clarity of the Statute's language would not impede her from acting pursuant to an illegal scheme.  And to the extent that the argument presents any merit, Prime's contention that it lacked notice that Harris's political ambitions would factor into her review of the DCHS transaction is contradicted by Prime's FAC: Prime alleges repeatedly that it "expected opposition" from the Attorney General prior to submitting the transaction for Harris's review.  (*See, e.g.*, FAC ¶¶ 6, 7, 11, 64.)

For the foregoing reasons, Prime's as-applied void for vagueness challenge to the constitutionality of the Nonprofit Hospital Transfer Statute fails.

/ / / /

1   **VI.     Abstention**

2          Defendant requests that the Court abstain from adjudicating this dispute under the

3   *Pullman* abstention doctrine.  (Dkt. No. 49-1 at 46.)

4          "The *Pullman* abstention doctrine allows district courts, in *exceptional* cases, to

5   postpone the exercise of jurisdiction.  Federal courts should abstain in cases presenting a

6   federal constitutional issue if constitutional adjudication could be avoided or if the

7   constitutional question could be narrowed by a ruling on an uncertain question of state

8   law." *Pearl Inv. Co. v. City & Cty. of San Francisco*, 774 F.2d 1460, 1462 (9th Cir.

9   1985) (emphasis added).  "If a court invokes *Pullman* abstention, it should stay the

10  federal constitutional question until the matter has been sent to state court for a

11  determination of the uncertain state law issue." *Fireman's Fund Ins. Co. v. City of Lodi,*

12  *California*, 302 F.3d 928, 940 (9th Cir. 2002), *as amended on denial of reh'g and reh'g*

13  *en banc* (Oct. 8, 2002) (internal citation and quotation marks omitted).  District courts

14  have discretion to abstain.  *Pearl Inv. Co.*, 774 F.2d at 1462.

15         There are three concurrent criteria for *Pullman* abstention:

16         (1) The complaint "touches a sensitive area of social policy upon which the federal
           courts ought not to enter unless no alternative to its adjudication is open."
17         (2) "Such constitutional adjudication plainly can be avoided if a definitive ruling
           on the state issue would terminate the controversy."
18         (3) The possibly determinative issue of state law is doubtful.
19

20  *Id.* at 1463 (internal citation omitted).  "In applying these criteria, the district court should

21  identify the state law issues that might be determinative or critical to the case's outcome

22  and should explain why the resolution of those issues is uncertain." *Id.*

23         Defendant does not sufficiently identify a determinative issue of state law or

24  articulate why the resolution of the issue is uncertain.  Defendant argues that the

25  constitutionality of the Statute should be reviewed in state court.  (Dkt. No. 31 at 35.)

26  Given that Prime is no longer pursuing its state constitutional challenges to the Statute,

27  the only constitutional challenges that remain are under the Fourteenth Amendment and

28  are not issues of state law.

1   Defendant proffers only one state law issue, urging that the Court abstain "unless
2   and until there is review of the ten-year conditions in state court."  (Dkt. No. 49-1 at 46.)
3   Defendant does not adequately articulate how a state court ruling would "terminate the
4   controversy" and result in the conclusion that "constitutional adjudication plainly can be
5   avoided."  *Pearl Inv. Co.*, 774 F.2d at 1463.  Nor does Defendant sufficiently explain
6   why the resolution of this state law issue is uncertain.  *See id.* at 1465 ("Uncertainty for
7   purposes of *Pullman* abstention means that a federal court cannot predict with any
8   confidence how the state's highest court would decide an issue of state law.").
9   Accordingly, the Court declines to abstain from adjudicating this case.

## VII.   Leave to Amend

11   Where a motion to dismiss is granted, "leave to amend should be granted 'unless
12   the court determines that the allegation of other facts consistent with the challenged
13   pleading could not possibly cure the deficiency.'"  *DeSoto v. Yellow Freight Sys., Inc.*,
14   957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture*
15   *Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)).  In other words, where leave to amend would
16   be futile, the Court may deny leave to amend.  *See Desoto*, 957 F.2d at 658; *Schreiber*,
17   806 F.2d at 1401.

18   Plaintiffs' claims for relief suffer from a number of legal deficiencies that cannot
19   be cured by amendment.  Plaintiffs cannot allege a liberty or property interest cognizable
20   under the Fourteenth Amendment for their substantive due process claim or for their
21   procedural due process challenge to the Nonprofit Hospital Transfer Statute's
22   constitutionality.  Plaintiffs cannot overcome the fact that the conditions Defendant
23   imposed on the DCHS transaction objectively did not require Prime to unionize.
24   Plaintiffs cannot establish that the Statute is void for vagueness in all of its applications
25   and as applied to Prime.  Because leave to amend would be futile, the Court dismisses
26   with prejudice Plaintiffs' (1) § 1983 claim for violation of Plaintiffs' rights under the Due
27   Process Clause of the Fourteenth Amendment, (2) § 1983 claim for violation of
28   Plaintiffs' rights under the NLRA, (3) request for a declaratory judgment that the

Nonprofit Hospital Transfer Statute is unconstitutional under the Fourteenth Amendment, both facially and as applied to Plaintiffs; and (5) request for a permanent injunction enjoining Harris from enforcing the Statute, both generally and with respect to Plaintiffs.

Out of an abundance of caution, the Court dismisses without prejudice Plaintiffs' § 1983 claim for violation of Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment.  To the extent that Plaintiffs can show that similarly situated comparators exist, and that Defendant lacked a rational basis for her conduct, leave to amend may not be futile.

<strong>CONCLUSION</strong>

For the foregoing reasons, the Court:

1. **DENIES** Defendant's motion to dismiss Plaintiffs' FAC pursuant to Federal Rule of Civil Procedure 12(b)(1) (Dkt. No. 49.);

2. **GRANTS** Defendant's motion to dismiss with prejudice Plaintiffs' FAC pursuant to Federal Rule of Civil Procedure 12(b)(6) as to Plaintiffs' first, third, fourth, and fifth claims for relief (Dkt. No. 49);

3. **GRANTS** Defendant's motion to dismiss without prejudice Plaintiffs' FAC pursuant to Federal Rule of Civil Procedure 12(b)(6) as to Plaintiffs' second claim for relief only (Dkt. No. 49); and

4. **DENIES AS MOOT** Plaintiffs' Ex Parte Application to Strike New Arguments and Evidence in Defendant's Reply Brief (Dkt. No. 50).

**IT IS SO ORDERED.**

Dated:  October 31, 2016

Hon. Gonzalo P. Curiel
United States District Judge