UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

PRIME HEALTHCARE SERVICES, INC., and PRIME HEALTHCARE FOUNDATION, INC.,

Plaintiffs,

v.

KAMALA D. HARRIS, in her personal capacity, and XAVIER BECERRA, in his official capacity as the Attorney General of the State of California,

Defendants.

Case No.:  3:16-cv-00778-GPC-AGS

**ORDER DENYING DEFENDANTS' MOTION TO STRIKE AND GRANTING DEFENDANTS' MOTION TO DISMISS**

**[ECF No. 62.]**

Before the Court is Defendants Kamala D. Harris ("Defendant" or "Harris") and Attorney General of California Xavier Becerra's[1] ("Defendant's" or "Becerra's") (collectively, "Defendants'") motion to dismiss Plaintiffs Prime Healthcare Services, Inc. and Prime Healthcare Foundation, Inc.'s ("Plaintiffs'" or "Prime's") Second Amended Complaint ("SAC") pursuant to Federal Rule of Civil Procedure 12(b)(6) and to strike the

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Attorney General Becerra is automatically substituted as a party for former Attorney General Harris.

*quid pro quo* allegations in Plaintiffs' SAC pursuant to Federal Rule of Civil Procedure 12(f).[2]  (Dkt. No. 62.)  The motion has been fully briefed.  (Dkt. Nos. 69, 74.)

The Court conducted a hearing on April 28, 2017.  (Dkt. No. 76.)  John Alfred Mills, Esq. appeared on behalf of Plaintiffs.  (*Id.*)  S. Michele Inan, Esq. and Sharon O'Grady, Esq. appeared on behalf of Defendants.  (*Id.*)

Having reviewed the parties' arguments and the applicable law, and for the reasons set forth below, the Court **DENIES** Defendants' motion to strike Prime's *quid pro quo* allegations, **GRANTS** Defendants' motion to dismiss Prime's 42 U.S.C. § 1983 claim against Harris in her personal capacity for violation of the Equal Protection Clause, and **GRANTS** Defendants' motion to dismiss Prime's 42 U.S.C. § 1983 claim against Becerra in his official capacity for prospective injunctive relief.  (Dkt. No. 62.)

## BACKGROUND

### I.    The Parties

Plaintiff Prime Healthcare Services, Inc. is a California corporation that owns and operates twenty-eight hospitals throughout the country.  (Dkt. No. 57, SAC ¶ 21.) Plaintiff Prime Healthcare Foundation, Inc. is a nonprofit public charity that owns seven nonprofit hospitals, each of which was donated by Prime Healthcare Services, in various states.[3]  (*Id.* ¶ 22.)  Defendant Kamala D. Harris was the Attorney General of California during the events giving rise to the instant litigation and at the time the instant action was filed.  (*Id.* ¶ 24.)  Defendant Xavier Becerra is the current Attorney General of California. This action stems from Harris's allegedly improper, *de facto* denial of Prime's proposed acquisition of the Daughters of Charity Health System ("DCHS"), a group of five financially distressed hospitals and a skilled nursing facility.  (*Id.* ¶¶ 1, 2, 14, 90.) Prime's core contention is this—at the behest of Service Employees International Union-

---

[2] Citations are based upon CM/ECF pagination.
[3] Prime Healthcare Services, Inc. and Prime Healthcare Foundation, Inc. will hereinafter be referred to collectively as "Plaintiffs" or "Prime."

United Healthcare Workers West, Harris effectively denied the Prime-DCHS transaction by imposing untenable requirements on Prime to continue operating five of the six DCHS facilities in their current state for ten years. (*Id.* ¶¶ 1, 14.)

## II. Statutory and Regulatory Background

The Attorney General supervises all charitable organizations and enforces the obligations of trustees, nonprofits, and fiduciaries that hold or control property in trust for charitable purposes.[4]  Pursuant to California Corporations Code §§ 5914–5925 ("the Nonprofit Hospital Transfer Statute" or "the Statute"), a nonprofit corporation that operates a health facility must provide notice to and obtain the written consent of the Attorney General prior to entering into an agreement to sell a material amount of its assets to a for-profit corporation.[5]  Cal. Corp. Code § 5914(a)(1).  The Attorney General has "discretion to consent to, give conditional consent to, or not consent to any agreement or transaction." *Id.* § 5917.

In making this determination, the Attorney General "shall consider any factors that the Attorney General deems relevant," including, but not limited to, a non-exhaustive list of nine factors specified by the Statute and the corresponding implementing regulations. *Id.*; *see also* Cal. Code Regs. tit. 11, § 999.5(f).  The factors span an expansive range of considerations, from the terms of the agreement to antitrust concerns and the public interest.  *See* Cal. Corp. Code § 5917; Cal. Code Regs. tit. 11, § 999.5(f).  They include, *inter alia*, whether "[t]he terms and conditions of the agreement or transaction are fair and reasonable to the nonprofit corporation," whether the transaction "will result in

---

[4] Supervisory and enforcement authority is granted to the Attorney General under the Supervision of Trustees and Fundraisers for Charitable Purposes Act, Cal. Gov't Code §§ 12580–12599.8; the Nonprofit Corporation Law, Cal. Corp. Code §§ 5000–6216; the Solicitations for Charitable Purposes Law, Cal. Bus. & Prof. Code §§ 17510–17510.95; and provisions of the California Business and Professions Code that prohibit unlawful, unfair, or fraudulent business acts or practices within California, *id.* §§ 17200–17210.

[5] Cal. Corp. Code §§ 5914–5919 govern transactions from nonprofit entities to for-profit entities.  Cal. Corp. Code §§ 5920–5923 govern transactions between nonprofit entities.

inurement to any private person or entity," whether the transaction "is at fair market value," with "fair market value" meaning "the most likely price that the assets being sold would bring in a competitive and open market under all conditions requisite to a fair sale," whether "[t]he market value has been manipulated by the actions of the parties in a manner that causes the value of the assets to decrease," whether "[t]proposed use of the proceeds from the agreement or transaction is consistent with the charitable trust on which the assets are held by the health facility or by the affiliated nonprofit health system," whether the transaction "involves or constitutes any breach of trust," whether "[t]he Attorney General has been provided . . . with sufficient information and data by the nonprofit corporation to evaluate adequately the agreement or transaction or the effects thereof on the public," whether the transaction "may create a significant effect on the availability or accessibility of health care services to the affected community," and whether the transaction is "in the public interest." Cal. Corp. Code § 5917; *see also* Cal. Code Regs. tit. 11, § 999.5(f).

If consent is granted to a transaction, the Attorney General's policy is to "require for a period of at least five years the continuation at the hospital of existing levels of essential healthcare services, including but not limited to emergency room services." Cal. Code Regs. tit. 11, § 999.5(f)(8)(C). It is also the policy of the Attorney General "to require for a period of at least five years that a minimum level of annual charity costs be incurred by the hospitals that are the subject of the agreement or transaction." *Id.* § 999.5(f)(8)(B). Notwithstanding this policy, the Attorney General "retain[s] complete discretion to determine whether this policy shall be applied in any specific transaction under review." *Id.* § 999.5(f)(8)(B)–(C). Further, "[p]otential adverse effects on availability or accessibility of health care may be mitigated through provisions negotiated between the parties to the transaction, through conditions adopted by the Attorney General in consenting to the proposed transaction, or through any other appropriate means." *Id.* § 999.5(f)(8)(A).

The Attorney General considers information from a variety of sources in making the determination on a proposed transaction. The selling entity must submit to the Attorney General details about the transaction, reasons for the sale, the fair market value of the transaction, and the impact of the sale on the availability and accessibility of healthcare services in the community affected by the sale, among other information. Cal. Corp. Code § 5914(b); Cal. Code Regs. tit. 11, § 999.5(d). The written notice must include a section entitled "Impacts on Health Care Services." Cal. Code Regs. tit. 11, § 999.5(d)(5). This section of the written notice must include, *inter alia*, a "description of all charity care provided in the last five years by each health facility"; a "description of all services provided by each health facility . . . in the past five years to Medi-Cal patients, county indigent patients, and any other class of patients," including details about "the type and volume of services provided, the payors for the services provided, the demographic characteristics of and zip code data for the patients served by the health facility . . . and the costs and revenues for the services provided"; a "description of current policies and procedures on staffing for patient care areas; employee input on health quality and staffing issues; and employee wages, salaries, benefits, working conditions and employment protections," including "a list of all existing staffing plans, policy and procedure manuals, employee handbooks, collective bargaining agreements or similar employment-related documents"; "all existing documents setting forth any guarantees made by any entity that would be taking over operation or control of the health facility . . . relating to employee job security and retraining, or the continuation of current staffing levels and policies, employee wages, salaries, benefits, working conditions and employment protections"; and a "statement describing all effects that the proposed agreement or transaction may have on health care services provided by each facility proposed to be transferred." *Id.* The Attorney General may also request that the seller provide additional information that he or she deems reasonably necessary to make the determination. *Id.* § 999.5(c)(2).

Before issuing a written decision, the Attorney General must conduct one or more public meetings in order to hear comments from interested parties. Cal. Corp. Code § 5916. The Attorney General's policy is to receive and consider all relevant information concerning the proposed transaction from "[a]ny interested person." Cal. Code Regs. tit. 11, § 999.5(e)(7). The Attorney General may contract with consultants and experts to review the proposed sale or receive expert opinion from any state agency. *Id.* § 999.5(e)(4).

If a proposed transaction affects an acute care hospital with more than fifty beds or may result in a significant effect on the availability or accessibility of existing healthcare services, the Attorney General prepares an independent healthcare impact statement that evaluates the transaction's potential impact on the availability and accessibility of services to the affected community. *Id.* § 999.5(e). The independent statement may assess factors such as the transaction's potential impact on the "level and type of charity care that the hospital has historically provided" and the "provision of health care services to Medi-Cal patients, county indigent patients, and any other class of patients." *Id.* § 999.5(e)(6). The information in the statement is then used to consider whether the proposed transaction may "create a significant effect on the availability or accessibility of health care services," one of the nine factors listed in Cal. Corp. Code § 5917. *Id.* § 999.5(e). The statement is public. *Id.* § 999.5(e)(3)(D).

The Attorney General notifies the applicant of the decision in writing. Cal. Corp. Code § 5915. The decision is reviewable in state court in an administrative mandamus proceeding. Cal. Civ. Proc. Code § 1085.

## III. Factual Background

### A. The Alleged Agreement Between Harris and SEIU-UHW

Since 2009, Prime has been engaged in a protracted dispute with Service Employees International Union-United Healthcare Workers West ("SEIU-UHW"), a labor union that represents California hospital workers, in large part due to Prime's

unwillingness to allow SEIU-UHW to unionize Prime's California hospitals.[6]  (SAC ¶ 10.)  Prime alleges that Harris entered into an unlawful scheme with SEIU-UHW: in exchange for SEIU-UHW's political and financial support of her United States Senate campaign, Harris would prevent Prime from acquiring nonprofit hospitals in California unless Prime agreed to allow SEIU-UHW to unionize its hospital workers.  (*Id.* ¶¶ 112– 14.)  Prime alleges that pursuant to this unlawful scheme, Harris "refus[ed] to reasonably approve the sale of [DCHS] to [Prime] because Prime rejected [SEIU-UHW's] extortionate demands . . . to unionize workers at all Prime hospitals."  (*Id.* ¶ 1.)[7]

As evidence for this scheme, Prime cites SEIU-UHW's donations to Harris's 2010 and 2014 campaigns for Attorney General.  (*Id.* ¶ 37.)  Prime alleges on information and belief that SEIU-UHW promised Harris up to $25 million in political contributions to her United States Senate campaign if she denied Prime's acquisition or imposed conditions that would effect a *de facto* denial of the DCHS sale.  (*Id.* ¶ 38.)  Prime also alleges on information and belief that SEIU-UHW advised Harris that the union would support Harris's opposing candidates if she refused to comply with the union's demands.  (*Id.*)

**B. The Prime-VVCH Transaction**

On September 20, 2011, Harris denied consent to Prime Healthcare Foundation's proposed acquisition of Victor Valley Community Hospital ("VVCH").  (*Id.* ¶¶ 42–60.) Prime asserts that Harris's denial of the VVCH transaction was the first and only time

---

[6] In 2011, Prime Healthcare Services, Inc. filed suit alleging that SEIU, UHW, Kaiser Permanente, and several Kaiser-related entities engaged in an antitrust conspiracy to eliminate Prime from the healthcare market and increase healthcare workers' wages.  *Prime Healthcare Servs., Inc. v. Serv. Employees Int'l Union*, No. 11-CV-2652-GPC-RBB, 2013 WL 3873074, at *1 (S.D. Cal. July 25, 2013), *aff'd*, 642 F. App'x 665 (9th Cir. 2016).  In 2014, Prime filed suit alleging that the SEIU, UHW, and other related entities and individuals engaged in a Racketeering Influenced and Corrupt Organization Act conspiracy to unionize Prime or force Prime out of the healthcare market.  *Prime Healthcare Servs., Inc. v. Servs. Employees Int'l Union*, 147 F. Supp. 3d 1094, 1097 (S.D. Cal. 2015).

[7] Prime maintains its stance that Harris formed a *quid pro quo* agreement with SEIU-UHW, despite the Court's previous finding that the *quid pro quo* allegations failed to pass muster under Federal Rule of Civil Procedure 12(b)(6).  (SAC at 2 n.1.)  The Court reiterates its conclusion that its dismissal of Prime's FAC did not depend on the plausibility of Prime's *quid pro quo* allegations.  (*See* Dkt. No. 54 at 16 n.14.)

Harris denied the sale of a California nonprofit hospital. (*Id.* ¶¶ 51, 94.) Prime does not appear to seek relief with respect to the VVCH transaction.

Prime alleges on information and belief that Harris denied the 2011 VVCH sale at SEIU-UHW's request. (*Id.* ¶¶ 44–45, 50.) In support of its assertion, Prime cites examples of statements and conduct by SEIU-UHW. An SEIU-UHW attorney stated at a bankruptcy hearing that Harris would deny the VVCH transaction; SEIU-UHW campaigned against the sale; and SEIU-UHW opposed the sale at the Attorney General's public hearing on the transaction. (*Id.* ¶¶ 42, 44, 47.) Harris denied the sale, stating generally that it was not in the public's best interest. (*Id.* ¶ 49.) After Harris denied Prime's proposed acquisition of VVCH, SEIU-UHW publicly claimed credit for the decision. (*Id.* ¶¶ 42, 59.)

During labor negotiations with Prime in July 2014, Dave Regan, president of SEIU-UHW, stated that Harris denied the VVCH sale to Prime at the union's request. (*Id.* ¶ 50.) In 2015, a senior staff member in the Attorney General's Office informed Prime that Harris had "made a mistake and was inexperienced and new to the job" when she denied consent to the VVCH transaction. (*Id.*)

**C. The Prime-DCHS Transaction**

Facing financial difficulty in 2014, the Daughters of Charity Health System decided to sell five nonprofit hospitals and a skilled nursing facility that it owned and operated in California.[8] (*Id.* ¶¶ 3, 62, 91.) After a thirteen-month bidding process, DCHS selected Prime's bid to purchase the hospitals on October 10, 2014. (*Id.* ¶¶ 4, 7, 75.) Alongside acknowledging Prime's strengths, DCHS identified the potential shortcomings of a Prime transaction, citing resistance from SEIU-UHW, potential transaction resistance from the Attorney General and California politicians, and Prime's litigious history. (*Id.* ¶

---

[8] The hospitals are (1) Seton Medical Center in Daly City, California, (2) O'Connor Hospital in San Jose, California, (3) Saint Louise Regional Hospital in Gilroy, California, (4) St. Francis Medical Center in Lynwood, California, and (5) St. Vincent Medical Center in Los Angeles, California. (SAC ¶ 3.) The skilled nursing facility is Seton Coastside in Moss Beach, California. (*Id.*)

6.) DCHS and Prime's sale agreement required Prime to keep each of the hospitals open and to "maintain all existing healthcare services, including emergency rooms and trauma centers, for at least five years." (*Id.* ¶ 75.) DCHS submitted written notice of the proposed sale to the Attorney General on October 24, 2014. (*Id.* ¶¶ 8, 78.) Prime alleges that its proposed acquisition was "the single largest hospital transaction ever reviewed by the Attorney General's office" and "the largest bail-out of non-profit hospitals in California history." (*Id.* ¶¶ 8–9.)

The Attorney General's Office made public five healthcare impact statements prepared by MDS Consulting. (*Id.* ¶ 79.) Harris allegedly requested that these statements recommend requiring Prime to continue operating five of the six DCHS facilities in their current state for a period of ten years. (*Id.* ¶¶ 15, 79, 88, 122.) On information and belief, Prime alleges that Harris made this request "before the report or any studies had been generated." (*Id.* ¶¶ 79, 83.) In January 2015, the Attorney General received written comments and held multiple public hearings over a period of five days to receive input on the proposed sale. (*Id.* ¶ 82.)

In February 2015, prior to Harris's issuance of her final decision, Prime met with staff members of the Attorney General's Office to express its concerns about the proposed ten-year conditions. (*Id.* ¶ 85.) The Attorney General's Office stated that the ten-year conditions were non-negotiable, and that Harris would require a ten-year commitment for future sales of nonprofit hospitals to for-profit operators in California. (*Id.* ¶ 86.)

**D. The Attorney General's Decision**

On February 20, 2015, the Attorney General conditionally consented to the Prime-DCHS transaction. (*Id.* ¶¶ 14, 87, 93.) Harris imposed numerous conditions on the sale. (*Id.* ¶ 87.) Harris's conditions effectively required Prime to operate five hospitals as acute care facilities for ten years and to maintain the majority of current hospital services at each hospital, with the exception of St. Vincent Medical Center, for ten years. (*Id.*) Staff members of the Attorney General's Office informed Prime that Harris personally

requested the ten-year conditions. (*Id.* ¶¶ 15, 79, 83, 88.) Harris allegedly stated that the conditions were "unique and tailored to Prime." (*Id.* ¶ 120.)

Prime alleges that the Attorney General's unprecedented ten-year conditions rendered the proposed transaction financially unviable, requiring Prime to operate the financially failing hospitals at a loss for ten years. (*Id.* ¶¶ 18, 89–91, 93.) Accordingly, Prime characterizes the Attorney General's conditional approval of the DCHS sale as a *de facto* denial, as an outright denial of consent to the transaction was "politically impossible" for Harris. (*Id.* ¶¶ 14, 83, 91–92.) On March 10, 2015, Prime withdrew its bid to purchase the DCHS hospitals because of the ten-year conditions. (*Id.* ¶¶ 18, 90.)

**E. SEIU-UHW's Alleged Involvement**

Prime asserts that Harris *de facto* denied Prime's acquisition at the bidding of SEIU-UHW. (*Id.* ¶¶ 1–2, 17, 38.) As evidence, Prime cites various statements and conduct by SEIU-UHW. SEIU-UHW comprised the main source of public opposition to the Prime-DCHS deal, (*id.* ¶¶ 76–77, 81–82), and publicly took credit for Harris's decision to impose "unprecedented conditions" on Prime's acquisition of DCHS, (*id.* ¶ 89). Prime alleges on information and belief that SEIU-UHW's actions were "all political theater, designed to mask the fact that . . . Harris would ultimately follow the bidding of SEIU-UHW regardless of the true merits of Prime's bid to acquire the DCHS hospitals." (*Id.* ¶ 76.) For example, SEIU-UHW created a website to oppose Prime's bid.[9] (*Id.* ¶ 65.) SEIU-UHW aired television ads and initiated a calling campaign urging Harris to deny consent to the sale. (*Id.* ¶ 76.) SEIU-UHW and a competing bidder, Blue Wolf Capital Partners LLC ("Blue Wolf"), met with Harris to show Harris that an

---

[9] Prime alleges that DCHS filed a lawsuit against SEIU-UHW and Blue Wolf in state court. (SAC ¶ 81.) In the state lawsuit, DCHS alleged that SEIU-UHW represented to DCHS and Prime that it could "exert influence over the California Attorney General," that "[t]he SEIU Defendants . . . openly and explicitly threatened administrative action by the Attorney General against DCHS and Prime unless Prime agreed to provide unrelated benefits to these Defendants relating to non-DCHS hospitals," and that "[s]tatements and actions by the Attorney General confirm that the SEIU Defendants' extortionate scheme caused a delay in the [Attorney General's] approval process." (*Id.* (alterations in original).)

alternative buyer existed. (*Id.* ¶ 80.) SEIU-UHW passed a resolution calling on Harris to halt the sale of any hospital to Prime during the pendency of investigations of Prime for alleged Medicare fraud. (*Id.* ¶ 70.)

Prime alleges that SEIU-UHW threatened to withdraw its support for any Democratic politician who accepted contributions from Prime. (*Id.* ¶ 71.) SEIU-UHW issued a press release announcing that twenty-seven state legislators had submitted a letter to Harris asking her to stop the sale to Prime. (*Id.*) SEIU-UHW issued a subsequent announcement that thirty-eight state legislators, two United States Representatives, and other elected officials had signed the letter to Harris. (*Id.*)

Dave Regan, the president of SEIU-UHW, repeatedly informed Prime and DCHS that Harris would approve Prime's acquisition only if Prime agreed to allow SEIU-UHW to unionize workers at Prime's hospitals. (*Id.* ¶¶ 9 –11, 39–40, 61, 68–69, 83.) Regan boasted to Prime that "he has the influence with Harris to either make or break Prime with respect to the Prime-DCHS sale transaction," that Harris "would do what she was told and nothing more," that "a SEIU-UHW deal was the price for doing business in California and obtaining a sale approval from Harris," and that Regan "control[s] Harris and the political process in California." (*Id.* ¶¶ 39, 68, 83.)

Similarly, during Prime's 2014 labor negotiations with SEIU-UHW, Conway Collis (DCHS's senior advisor and primary lobbyist) and former Attorney General William Lockyer (a mediator for Prime's negotiations with SEIU-UHW) informed Prime that Harris would deny Prime's acquisition or require financially unviable conditions unless Prime agreed to SEIU-UHW's demands. (*Id.* ¶¶ 9, 12–13.) Collis and Lockyer allegedly informed Prime that they had learned of this condition from Harris. (*Id.* ¶¶ 12–13.)

**F. The BlueMountain-DCHS Transaction**

After Prime withdrew its bid to acquire DCHS, DCHS opened a new round of bidding for potential buyers. (*Id.* ¶ 103.) On or about July 17, 2015, DCHS entered into a System Restructuring and Support Agreement with BlueMountain Capital

Management, LLC ("BlueMountain") and Integrity Healthcare, LLC ("Integrity"), a company owned by BlueMountain. (*Id.*) Unlike Prime, BlueMountain received political support from SEIU-UHW. (*Id.* ¶ 102.) Pursuant to the restructuring agreement, Integrity would manage DCHS in exchange for a management fee of 4% of DCHS's annual operating revenue, and BlueMountain would have the option to purchase the hospitals, beginning three years from the closing date. (*Id.* ¶ 103.) The agreement required BlueMountain to maintain the DCHS hospitals for five years. (*Id.*)

Prime distinguishes the BlueMountain-DCHS agreement from its proposed acquisition of DCHS. (*Id.*) Prime avers that the agreement posed "little, if any, financial risk" for BlueMountain, as BlueMountain did not agree to actually purchase the hospitals. (*Id.*) If the hospitals closed within a year, BlueMountain would not be held responsible for the closure and would have no legal responsibility to keep the facilities open. (*Id.*)

On information and belief, Prime alleges that BlueMountain and DCHS, pursuant to a mitigation and performance improvement plan, collaboratively closed certain services—including ones that Harris had required Prime to maintain for ten years—and reduced labor and physician costs prior to submitting the DCHS-BlueMountain transaction to Harris for review. (*Id.* ¶¶ 104–05, 107.) Prime surmises that Harris informed DCHS and BlueMountain that she would approve the transaction before they even submitted it for review. (*Id.* ¶ 106.)

In August 2015, DCHS submitted notice to the Attorney General of a proposed transaction with BlueMountain. (*Id.* ¶ 109.) Harris conditionally approved the transaction in December 2015. (*Id.*) As she did with the Prime-DCHS transaction, Harris required that existing service lines be maintained for ten years. (*Id.* ¶ 109.) Notwithstanding Harris's imposition of ten-year conditions on the BlueMountain-DCHS transaction, Prime alleges BlueMountain received "less onerous" conditions than the ones Harris imposed on Prime, largely due to the fact that DCHS and BlueMountain closed several service lines and programs before submitting the transaction to Harris for review.

(*Id.* ¶¶ 110–11.)  Prime alleges on information and belief that Harris imposed the ten-year conditions on account of Prime filing the instant lawsuit in September 2015.  (*Id.* ¶ 109.)

## IV.    Procedural Background

Prime filed a Complaint in the United States District Court for the Central District of California on September 21, 2015, (Dkt. No. 1), and filed a FAC on November 12, 2015, (Dkt. No. 14).  Prime asserted five claims for relief in the FAC: (1) a 42 U.S.C. § 1983 claim for violation of Prime's rights under the Due Process Clause of the Fourteenth Amendment; (2) a 42 U.S.C. § 1983 claim for violation of Prime's rights under the Equal Protection Clause of the Fourteenth Amendment; (3) a 42 U.S.C. § 1983 claim for violation of Prime's rights under the National Labor Relations Act, 29 U.S.C. §§ 151–169; (4) a declaratory judgment that Cal. Corp. Code §§ 5914–5925 is unconstitutional under the Fourteenth Amendment, both facially and as applied to Prime; and (5) a permanent injunction enjoining Harris from enforcing Cal. Corp. Code §§ 5914–5925, both generally and with respect to Prime.  (Dkt. No. 14.)

Harris moved to transfer the case to the United States District Court for the Southern District of California or, in the alternative, to dismiss Prime's FAC on November 30, 2015.  (Dkt. Nos. 17, 18.)  Harris's motion to transfer was granted on March 31, 2016 by Chief Judge George H. King of the United States District Court for the Central District of California.  (Dkt. No. 38.)  Accordingly, Harris's motion to dismiss, (Dkt. No. 18), and Prime's *Ex Parte* Application to Strike New Arguments and Evidence in Defendant's Reply Brief, (Dkt. No. 35), were denied without prejudice to their reassertion in the transferee court, (Dkt. No. 38).  On April 12, 2016, the parties jointly moved the Court to accept as reasserted and filed Harris's motion to dismiss Prime's FAC and *Ex Parte* Application, together with all related briefing.  (Dkt. No. 42.)  Judge John A. Houston of the United States District Court for the Southern District of California granted the parties' joint motion on April 12, 2016.  (Dkt. No. 43.)  The case was reassigned to the undersigned judge on July 11, 2016.  (Dkt. No. 44.)

The Court held a hearing on Harris's motion to dismiss Prime's FAC on September 30, 2016.  (Dkt. No. 51.)  On October 31, 2016, the Court granted in part and denied in part Harris's motion to dismiss Prime's FAC.  (Dkt. No. 54.)  The Court dismissed all claims with prejudice except for Prime's § 1983 claim for violation of Prime's rights under the Equal Protection Clause of the Fourteenth Amendment.  (Dkt. No. 54 at 44–45.)

Prime filed a SAC on November 30, 2016.  (Dkt. No. 57.)  In the SAC, Prime asserts a 42 U.S.C. § 1983 claim against Harris in her personal capacity for violation of its equal protection rights under the Fourteenth Amendment.  (SAC ¶¶ 117–24.)  Prime also seeks injunctive relief under 42 U.S.C. § 1983, requesting a permanent injunction preventing the Attorney General of California from enforcing Cal. Corp. Code §§ 5914–5925 in a manner that violates its equal protection rights.  (SAC ¶ 126.)

Harris and Becerra filed the instant motion to dismiss on January 27, 2017.  (Dkt. No. 62.)  Prime responded on March 17, 2017, (Dkt. No. 69), and Defendants replied on April 7, 2017, (Dkt. No. 74).  The Court conducted a hearing on April 28, 2017 and took the matter under submission.  (Dkt. No. 76.)

**LEGAL STANDARDS**

**A. Rule 12(b)(6)**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Dismissal is warranted under Rule 12 (b)(6) where the complaint lacks a cognizable legal theory.  *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984); *see also Neitzke v. Williams*, 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law.").  Alternatively, a complaint may be dismissed where it presents a cognizable legal theory yet fails to plead essential facts under that theory.  *Robertson*, 749 F.2d at 534.  While a plaintiff need not give "detailed factual allegations," a plaintiff must plead sufficient facts that, if true, "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

545 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 547). A claim is facially plausible when the factual allegations permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In other words, "the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all factual allegations and must construe all inferences from them in the light most favorable to the nonmoving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002); *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). Legal conclusions, however, need not be taken as true merely because they are cast in the form of factual allegations. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1200 (9th Cir. 2003); *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981). When ruling on a motion to dismiss, the court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when authenticity is not contested, and matters of which the court takes judicial notice. *Lee v. Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001).

## B. Rule 12(f)

Under Federal Rule of Civil Procedure 12(f), the Court may, by motion or on its own initiative, strike "an insufficient defense or any redundant, immaterial, impertinent or scandalous" matter from the pleadings. Fed. R. Civ. P. 12(f). The purpose of Rule 12(f) is "to avoid the expenditure of time and money that must arise from litigating spurious issues by disposing of those issues prior to trial." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010) (quoting *Fantasy, Inc. v. Fogerty*, 984 F.2d

1524, 1527 (9th Cir. 1993), *rev'd on other grounds by Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994)).

The Court must view the pleading in the light more favorable to the pleader when ruling on a motion to strike. *In re 2TheMart.com, Inc. Sec. Litig.*, 114 F. Supp. 2d 955, 965 (C.D. Cal. 2000) (citing *California v. United States*, 512 F. Supp. 36, 39 (N.D. Cal. 1981)). Motions to strike are regarded with disfavor because striking is such a drastic remedy. *Freeman v. ABC Legal Servs., Inc.*, 877 F. Supp. 2d 919, 923 (N.D. Cal. 2012). If a claim is stricken, leave to amend should be freely given when doing so would not cause prejudice to the opposing party. *Vogel v. Huntington Oaks Delaware Partners*, LLC, 291 F.R.D. 438, 440 (C.D. Cal. 2013) (citing *Wyshak v. City Nat'l Bank*, 607 F.2d 824, 826 (9th Cir. 1979)).

## C. Requests for Judicial Notice

Defendants filed a request for judicial notice in support of their motion, (Dkt. No. 64), to which Plaintiffs objected, (Dkt. No. 70), and Defendants replied, (Dkt. No. 74-1). Plaintiffs separately filed a request for judicial notice in support of the opposition to Defendants' motion, (Dkt. No. 71), to which Defendants objected, (Dkt. No. 74-2).

Generally, a court may not consider materials outside of the pleadings in ruling on a Rule 12(b)(6) motion without converting the motion into a Rule 56 motion for summary judgment. *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). Two exceptions to this general rule exist—"documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

First, "a court may consider 'material which is properly submitted as part of the complaint' on a motion to dismiss without converting the motion to dismiss into a motion for summary judgment." *Id.* (citation omitted). "Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Put simply, "a court may

consider evidence on which the complaint necessarily relies if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (citation and internal quotation marks omitted); *see also Lee*, 250 F.3d at 688. A "defendant may offer such a document, and the district court may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Ritchie*, 342 F.3d at 908. To illustrate, "[t]he doctrine of incorporation by reference may apply . . . when a plaintiff's claim about insurance coverage is based on the contents of a coverage plan, or when a plaintiff's claim about stock fraud is based on the contents of SEC filings." *Id.* (citations omitted).

Second, a "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). "[U]nder Fed. R. Evid. 201, a court may take judicial notice of 'matters of public record,'" *Lee*, 250 F.3d at 688–89 (citation omitted)), such as "information . . . made publicly available by government entities," *Daniels-Hall*, 629 F.3d at 998–99 (citing cases), and "records and reports of administrative bodies," *Ritchie*, 342 F.3d at 909. It follows, accordingly, that "disputed matters of fact"—or, phrased differently, facts "subject to reasonable dispute," Fed. R. Evid. 201(b)—are not properly subject to judicial notice, even if they are stated in public records. *Lee*, 250 F.3d at 690. On the other hand, courts "are not . . . required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall*, 629 F.3d at 998.

/ / / /

/ / / /

/ / / /

1    **1.  Defendants' RJN (Dkt. No. 64)**
2          **a.  Exhibits 1–6, 9–30**
3          Exhibits 1–6 and 9–30 consist of Harris's decisions regarding healthcare facility

4    transactions, healthcare impact reports prepared by her consultant, and a 2007 decision by

5    former Attorney General Edmund G. Brown, Jr. concerning Prime's acquisition of

6    Anaheim Memorial Medical Center.  (Dkt. No. 64 at 2.)  The Court **GRANTS**

7    Defendants' RJN with respect to these exhibits because Exhibits 1–30 consist of matters

8    of public record, and because Prime's SAC refers to the transactions detailed in Exhibits

9    1–29.  The Court **SUSTAINS** Plaintiffs' objections insofar as Defendants seek judicial

10   notice of disputed matters of fact.

11         **b.  Exhibits 7, 7.1, and 7.2**

12         Exhibits 7, 7.1, and 7.2 consist of the agreement between DCHS and

13   BlueMountain.  (Dkt. No. 64 at 2–3.)  The Court **GRANTS** Defendants' RJN with

14   respect to these exhibits because Exhibits 7, 7.1, and 7.2 consist of matters of public

15   record.  The Court **SUSTAINS** Plaintiffs' objections insofar as Defendants seek judicial

16   notice of disputed matters of fact.

17         **c.  Exhibit 8**

18         Exhibit 8 is an email dated September 3, 2015 from the Office of the Attorney

19   General distributing the DCHS mitigation plan to interested parties, including Prime.

20   (Dkt. No. 64 at 3.)  The Court **DENIES** Defendants' RJN with respect to this exhibit.

21   Although Plaintiffs reference in their SAC the mitigation plan distributed by the email,

22   the email itself is not incorporated by reference, is not "generally known within the trial

23   court's territorial jurisdiction," and does not appear to "be accurately and readily

24   determined from sources whose accuracy cannot reasonably be questioned."  Fed. R.

25   Evid. 201(b).

26         **d.  Exhibits 31, 32, 35**

27         Exhibits 31, 32, and 35 consist of (1) Harris's memorandum of points and

28   authorities in opposition to a motion for peremptory writ of mandate filed in *Victor*

*Valley Community Hospital v. Kamala D. Harris, et al.* in the Superior Court of California, County of San Bernardino County (case no. CIV VS 11055565); (2) the petitioner Victor Valley Community Hospital's request for dismissal of the petition filed in the same action; and (3) the complaint in intervention filed June 2016 in *United States of America ex rel. Karin Berntsen v. Prime Healthcare Services Inc., et al.* in the United States District Court for the Central District of California (case no. CV-11-08214). (Dkt. No. 64 at 3–4.) The Court **GRANTS** Defendants' RJN with respect to these exhibits because Exhibits 31, 32, and 35 are state and federal court documents not subject to reasonable dispute. The Court **SUSTAINS** Plaintiffs' objections insofar as Defendants seek judicial notice of disputed matters of fact.

### e. Exhibits 33 and 34

Exhibits 33 and 34 are press articles reporting United States Senator Barbara Boxer's announcement that she would not seek reelection and Harris's announcement that she would run for election to Senator Boxer's seat. (Dkt. No. 64 at 4.) The Court **GRANTS** Defendants' RJN with respect to the dates of the two announcements, as they are facts not subject to reasonable dispute. The Court **SUSTAINS** Plaintiffs' objections insofar as Defendants seek judicial notice of disputed matters of fact.

### 2. Plaintiffs' RJN (Dkt. No. 71)

#### a. Exhibits A, C, D, and E

Exhibit A is purportedly a copy of Centinela Hospital Medical Center's website as it appeared on February 6, 2015. (Dkt. No. 71 at 2.) Exhibit C is purportedly a copy of PIH Health Hospital Downey's website as it appeared on or about February 2015. (*Id.*) Exhibit D is purportedly a copy of Whittier Hospital Medical Center's website as it appeared on or about March 2016. (*Id.*) Exhibit E is purportedly a copy of Kaiser Permanente Downey Medical Center's website as it appeared on March 13, 2017. (*Id.*)

Plaintiffs assert that each of the exhibits are copies of webpages taken from the Internet Archive, and are thus not subject to reasonable dispute. *See Erickson v. Nebraska Mach. Co.*, No. 15-CV-01147-JD, 2015 WL 4089849, at *1 (N.D. Cal. July 6,

2015) ("Courts have taken judicial notice of the contents of web pages available through the [Internet Archive's] Wayback Machine as facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." (citing *Pond Guy, Inc. v. Aquascape Designs, Inc.*, No. 13–13229, 2014 WL 2863871, at *4 (E.D. Mich. Jun. 24, 2014); *In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*, 2013 WL 6869410 (S.D.N.Y. Dec. 30, 2013)).

This assertion is not clear, however, with respect to Exhibit E, which does not bear the Internet Archive Wayback Machine watermark on the top of the exhibit. (*See* Dkt. No. 71-1 at 33–34.) With respect to Exhibit A, the date listed in the Internet Archive Wayback Machine watermark, although unclear, appears to indicate February 12, 2015, rather than February 6, 2015, as Plaintiffs suggest. (*See* Dkt. No. 71-1 at 2.) With respect to Exhibit C, the first page reflects February 15, 2015, but the second through fourth pages reflect dates in March 2015, contrary to Plaintiffs' representation that the exhibit reflects the website as it appeared on or about February 2015. (*See* Dkt. No. 71-1 at 19–22.) Finally, with respect to Exhibit D, the first page does not bear the Internet Archive Wayback Machine watermark, and the year of the date is obscured for the remaining pages. (*See* Dkt. No. 71-1 at 24–31.) These exhibits are in fact subject to reasonable dispute. The Court **DENIES** Plaintiffs' RJN with respect to Exhibits A, C, D, and E.

### b. Exhibit B

Exhibit B is a copy of the Office of Statewide Health Planning and Development 2015 Financial and Utilization Data Report. (Dkt. No. 71 at 2.) The Court **GRANTS** Plaintiffs' RJN with respect to Exhibit B because it is a public government report from a governmental website. However, the Court observes that the Court's ability to make use of this document is limited. The excerpt Plaintiffs provide to the Court is incomplete and largely consists of data and figures which are difficult to comprehend without explanation.

/ / / /

### c. Exhibit F

Exhibit F consists of a copy of the docket in *United States of America, ex rel. Marc Osheroff v. Tenet HealthCare Corporation, et al.* (case no. CV22253-PCH); the docket in *United States of America ex rel. Ralph Williams v. Health Management Associates, Inc., et al.* (case no. CV-00130-CDL); and the docket in *United States of America ex rel. Leatrice Ford v. Abbot Northwestern Hospital, et al.* (case no. CV-20071-PCH). (Dkt. No. 71 at 3.) The Court **GRANTS** Plaintiffs' RJN with respect to Exhibit F, as the dockets are judicial records not subject to reasonable dispute.

### d. Exhibits G, H, and I

Exhibit G is a copy of a letter dated January 2, 2015 from Robert Issai, former CEO of DCHS, to Deputy Attorney General Wendi A. Horwitz. (Dkt. No. 71 at 3.) Exhibit H is a copy of a letter dated February 9, 2015 from Troy Schell, Plaintiffs' General Counsel, to the Attorney General's Chief of Staff, Nathan Barankin. (*Id.*) Exhibit I is a copy of a letter dated February 27, 2015 from Troy Schell to Nathan Barankin. (*Id.*) The Court **GRANTS** Plaintiffs' RJN with respect to Exhibits G, H, and I, as they are matters of public record not subject to reasonable dispute.

### e. Exhibit J

Exhibit J is a copy of a report prepared by Verite Healthcare Consulting, LLC for the Office of the Attorney General regarding the University of Southern California's acquisition of Verdugo Hills Hospital. (Dkt. No. 71 at 3.) The Court **GRANTS** Plaintiffs' RJN with respect to Exhibit J, as it is a matter of public record not subject to reasonable dispute.

## DISCUSSION

Defendants move to strike Prime's *quid pro quo* allegations, arguing that the new allegations violate the Court's ruling on the prior motion to dismiss, and that the allegations do not pass muster under *Twombly* and *Iqbal*. (Dkt. No. 62-1 at 25–26.) Defendants move to dismiss Prime's SAC on three grounds: (1) the SAC fails to state a claim under the Equal Protection Clause; (2) Harris is entitled to qualified immunity on

the claim brought against her in her personal capacity; and (3) Prime's claim for injunctive relief is barred by the Eleventh Amendment, moot, non-justiciable, and improperly seeks an advisory opinion. (*Id.* at 27–42.) In the alternative, Defendants request that the Court abstain and dismiss this case under the *Younger* abstention doctrine. (*Id.* at 42–44.)

## I.    Motion to Strike

Defendants move to strike Prime's allegations of a *quid pro quo* conspiracy between Harris and SEIU-UHW on two grounds. First, Defendants raise the Court's prior conclusion that the *quid pro quo* scheme was implausible. (Dkt. No. 62-1 at 25.) Defendants argue that leave to amend the *quid pro quo* allegations was not granted, and that Prime fails to justify its late disclosure of its new *quid pro quo* allegations.[10] (*Id.* at 14, 25.) Prime responds that its equal protection claim does not depend on the existence of a *quid pro quo* scheme.[11] (Dkt. No. 69 at 21–22.) Rather, its core theory is that "Harris imposed the onerous and unprecedented conditions" on Prime "because of her political alignment (irrespective of any *quid pro quo* exchange) with SEIU-UHW." (Dkt. No. 69 at 21–22.)

Second, Defendants argue that Prime's two nonconclusory allegations—that (1) Collis and Lockyer informed Prime that it would not be able to obtain Harris's consent to the DCHS transaction unless Prime agreed to SEIU-UHW's unionization demands, and that (2) Collis and Lockyer learned of this condition directly from Harris—are implausible.[12] (Dkt. No. 62-1 at 25–26.) Specifically, Defendants contend that neither

---

[10] Defendants' citation to Federal Rule of Civil Procedure 60(b)(2) is misguided. (Dkt. No. 74 at 6.) Prime does not presently move for reconsideration of the Court's prior ruling on the plausibility of the *quid pro quo* scheme, (Dkt. No. 69 at 21–22), and does not need to present "newly discovered evidence" to justify amendment of its FAC.

[11] The Court reiterates its prior conclusion that its dismissal of Prime's FAC did not depend on the plausibility of Prime's *quid pro quo* allegations. (Dkt. No. 54 at 16 n.14.)

[12] Defendants argue that "at least some of the statements" by Collis and Lockyer were made in the course of mediation negotiations, which are privileged and inadmissible under California law. (Dkt. No. 62-1 at 26 n.15.) However, federal common law generally governs claims of privilege. Fed. R. Evid.

Collis nor Lockyer are alleged to represent or speak for Harris.  (*Id.*)  Somewhat unclearly, Defendants argue that "some events" detailed in Prime's SAC "allegedly occurred in November 2014 . . . two months before U.S. Senator Barbara Boxer announced her retirement and Harris announced that she would run for her Senate seat." (*Id.*)

Defendants have not shown how the *quid pro quo* allegations are "1) an insufficient defense; (2) redundant; (3) immaterial; (4) impertinent; or (5) scandalous." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973–74 (9th Cir. 2010).  It is true that the Court did not expressly permit Prime to amend its *quid pro quo* allegations. Nonetheless, such allegations are not necessarily immaterial—they may bear on the rational basis inquiry for Prime's equal protection claim, to the extent the allegations pass muster under *Iqbal* and *Twombly*.

Moreover, Defendants' arguments about the plausibility of Prime's two nonconclusory allegations are more properly brought under Rule 12(b)(6) than under Rule 12(f).  *See Whittlestone*, 618 F.3d at 974 (observing that "allow[ing] litigants to use [Rule 12(f)] as a means to dismiss some or all of a pleading . . . would . . . creat[e] redundancies within the Federal Rules of Civil Procedure, because a Rule 12(b)(6) motion . . . already serves such a purpose").  In any event, Defendants do not cite authority requiring Prime to allege that Collis and Lockyer represented or spoke for Harris.  Nor does the timing of Harris's Senate campaign announcement dislodge Prime's allegations regarding Harris's political alignment with SEIU-UHW.

Accordingly, the Court **DENIES** Defendants' motion to strike Prime's *quid pro quo* allegations.

////

---

501. The instant action solely involves federal claims; there is no claim or defense for which state law supplies the rule of decision.  *See id.*; *see also Agster v. Maricopa County*, 422 F.3d 836, 839 (9th Cir. 2005) ("Where there are federal question claims and pendent state law claims present, the federal law of privilege applies.").

## II. Motion to Dismiss

### A. Class-of-One Equal Protection Claim

Prime alleges a class-of-one equal protection claim against Harris in her personal capacity. (SAC ¶ 118.) To state a valid "class-of-one" claim under the Equal Protection Clause, Prime must allege that it has "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 601 (2008) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). Here, the elements at issue are (1) whether purchasers of nonprofit hospitals were similarly situated to Prime, and (2) whether there was a rational basis for the difference in treatment.

### 1. Similarly Situated

The Equal Protection "does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are *in all relevant respects alike*." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (emphasis added). Parties are similarly situated when their "situations are arguably indistinguishable." *Ross v. Moffitt*, 417 U.S. 600, 609 (U.S. 1974); *see also Erickson v. Cty. of Nevada ex rel. Bd. of Supervisors*, 607 F. App'x 711, 712 (9th Cir. 2015) ("Parties allegedly treated differently in violation of the Equal Protection Clause are similarly situated only when they are 'arguably indistinguishable.'" (citation omitted)).

The Court makes a number of threshold observations. To start, Prime conflates its "similarly situated" arguments with its allegations of disparate treatment and pretext. (*See* Dkt. No. 69 at 24–37.) Prime argues that it was (1) treated disparately under (2) pretextual justifications. Prime misses the initial step of showing that the entities treated more favorably than Prime were similarly situated. (*See, e.g.*, Dkt. No. 69 at 32 ("The purported distinction is just another example of Defendants contriving an after-the-fact basis to justify disparate treatment.").)

Prime's arguments stem from a fundamental misunderstanding. Pretext affects the rational basis element of a class-of-one claim; it does not diminish a plaintiff's obligation

to show similarly situated comparators. (Dkt. No. 62-1 at 33–34 (citing Dkt. No. 54 at 29–30).) Prime revives its argument, based on the Seventh Circuit's decision in *Swanson v. City of Chetek*, 719 F.3d 780 (7th Cir. 2013), that where there is "readily obvious animus" on a defendant's part, a plaintiff need not show an exact, one-to-one comparison with similarly situated comparators. (Dkt. No. 69 at 25.) In so arguing, Prime misstates the Court's prior Order. (*See id.*) Rather than adopting the Seventh Circuit's reasoning, the Court expressly indicated otherwise: "Contrary to Prime's contention, a finding of pretext on Defendants' part affects the 'rational basis' element of a class-of-one claim, not the 'similarly situated' element."[13] (Dkt. No. 54 at 29–30.)

The similarly situated inquiry's focus on comparing individuals does not square easily with this case. It is difficult, if not unrealistic, to effectively disentangle the individuals—the nonprofit hospital purchasers—from the transactions. A comparison of purchasers cannot be done without reference to the entities being purchased and the communities being affected. The statutory and regulatory framework governing the Attorney General's review process underscores the same—the terms of the transaction factor into the picture, as do broader considerations implicating the public interest. Even a cursory review of the information that must be submitted for each nonprofit hospital

---

[13] In reaching this conclusion, the Court examined the Ninth Circuit's decision in *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936 (9th Cir. 2004). (*See* No. 54 at 29–30.) Although the plaintiff in *Squaw Valley* asserted a class-of-one claim without presenting evidence of other similarly situated entities, *see* 375 F.3d at 945, the Ninth Circuit, in declining to rehear the case, subsequently clarified that the similarly situated prong was not raised or contested on summary judgment, *see Squaw Valley Dev. Co. v. Goldberg*, 395 F.3d 1062, 1063–64 (9th Cir. 2005) (denying petition for rehearing or rehearing en banc). In fact, the defendant had conceded on appeal that the plaintiff had been subjected to more oversight and regulatory and enforcement action than other similarly situated parties. *See id.* The Ninth Circuit emphasized that its statement about the lack of similarly situated comparators "was made in the context of demonstrating that the record supports that [the defendant] had a *rational basis* for his exceptionally close scrutiny and oversight of [the plaintiff]." *Id.* at 1063 (emphasis added). Accordingly, the Court declines to adopt the principle that a defendant's animus may diminish a plaintiff's obligation to show similarly situated comparators. If anything, the parties' continuing debate over the relationship between animus, the similarly situated element, and the rational basis element underscores the lack of clearly established law in this matter. *See infra* Part II.B.

transfer illustrates the complex web of community-specific variables implicated by each transaction. *See, e.g.*, Cal. Code Regs. tit. 11, § 999.5(d)(5). As is evident from their arguments, both parties appear to tacitly recognize that the similarly situated inquiry requires a holistic evaluation of entire transactions. The Court faces a dilemma in attempting to apply equal protection law to this case—there may simply be no similarly situated comparators to the Prime-DCHS transaction.

Having observed the above, the Court concludes that Prime has failed to plead facts plausibly showing that similarly situated comparators exist.

### a. Transactions Before the Prime-DCHS Agreement

SAC ¶ 95 provides a summary of nonprofit hospital transfers Harris approved between denying the Prime-VVCH transaction and *de facto* denying the Prime-DCHS deal. Four of the seven transactions Prime raises were transfers to nonprofit entities, not to for-profit entities. (*See* SAC ¶ 95.) The three remaining transactions are also dissimilar. The St. Rose Hospital transaction was a single-hospital transaction. (*See id.*) Moreover, the transaction was not an outright purchase and sale agreement—it was a management agreement with an option to purchase. (*See id.*) Both the Emanuel Medical Center and VVCH transactions were single-hospital transfers. (*See id.*)

### b. Transactions After the Prime-DCHS Agreement

SAC ¶¶ 96–97 provides a summary of nonprofit hospital transfers after Harris's *de facto* denial of the Prime-DCHS deal. Three of the five transactions were transfers to nonprofit entities. (*See id.* ¶¶ 96–97.) The remaining two transactions are also dissimilar. The Keiro transaction involved no hospitals—it entailed a transfer of a retirement home, an intermediate care facility, and two skilled nursing facilities. (*See id.*) The Gardens Regional transaction was a single-hospital transaction. (*See id.*)

### c. The BlueMountain-DCHS Agreement

Perhaps most tellingly, Prime distinguishes itself from BlueMountain in both its SAC and in its opposition brief. (*See id.* ¶ 103; Dkt. No. 69 at 34.) Prime alleges that BlueMountain is "a New York hedge fund with no healthcare experience and known as a

company that profited on the poor and was instrumental in the credit swap debacle that contributed to the 2008 Great Recession." (SAC ¶ 102.) Prime alleges that the BlueMountain-DCHS agreement posed "little, if any, financial risk" for BlueMountain, because BlueMountain did not agree to purchase the hospitals—it had an option to purchase the hospitals after a term of years.[14] (*Id.* ¶ 103.) Prime alleges that as a result, BlueMountain would not be held responsible for the closure and would have no legal responsibility to keep the facilities open. (*Id.*) Prime's takeaway is that "the BlueMountain transaction was quite different from the Prime-DCHS transaction." (Dkt. No. 69 at 34.)

Prime cannot have it both ways. Prime avers generally that other transactions were similar to the Prime-DCHS transaction on a macroscopic level, yet carefully distinguishes the BlueMountain-DCHS transaction based upon the particular terms of the agreement. Prime asserts that the unique circumstances of each transaction, such as the location of the subject nonprofit hospital, do not render transactions dissimilar, yet argues that "[e]ach of the DCHS hospitals was a separate facility serving a distinct community" and should be evaluated independently. (Dkt. No. 69 at 33.) Indeed, each of the DCHS hospitals—some large, some small—served entirely different geographic locations across California, (SAC ¶ 3), yet Prime omits any mention of the locations of the majority of the transactions it alleges are similarly situated comparators, (*see id.* ¶¶ 95–97). Prime asserts that the size of a transaction does not matter to the similarly situated inquiry, yet emphasizes in its SAC that the Prime-DCHS transaction was the single largest bailout of nonprofit hospitals reviewed by the Attorney General's Office. (*Id.* ¶¶ 8–9.) And while Prime alleges that Harris treated BlueMountain more leniently, Prime's allegations speak to disparate treatment, not whether BlueMountain was similarly situated.

---

[14] This distinction further belies how transactions such as the St. Rose Hospital transaction were not similar to the Prime-DCHS transaction.

Prime cannot allege that each transfer involved a transfer to a for-profit entity, or that the terms of each transaction were arguably indistinguishable. Prime ignores the circumstances of each transaction, such as the existing level of medical services maintained by the hospitals, the geographic location of the hospitals, the size of the facilities, the medical needs and demographics of the surrounding communities, and the availability of alternative medical services, among others. As Prime admits, each nonprofit hospital serves a "distinct community," and even slight differences in transaction terms can render transactions dissimilar at their core.

In light of the above, the Court concludes that Prime has not alleged facts plausibly showing the existence of similarly situated comparators.

## 2. Rational Basis

"[T]he rational basis prong of a 'class of one' claim turns on whether there is a rational basis for the *distinction*, rather than the underlying government *action*." *Gerhart*, 637 F.3d at 1023 (emphasis in original). "Unless a classification trammels fundamental personal rights or implicates a suspect classification, to meet constitutional challenge the law in question needs only some rational relation to a legitimate state interest." *Lockary v. Kayfetz*, 917 F.2d 1150, 1155 (9th Cir. 1990). Where there is "any reasonably conceivable state of facts that could provide a rational basis for the classification," the inquiry ends. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–14 (1993).

"This deferential standard of review is a paradigm of judicial restraint." *Id.* at 314. "'The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.'" *Id.* (quoting *Vance v. Bradley*, 440 U.S. 93, 97 (1979)). The Equal Protection Clause "applies equally to executive and legislative action." *See Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 590 n.4 (9th Cir. 2008) (citing *Nordlinger*, 505 U.S. at 16 n.8); *Immigrant Assistance Project of Los Angeles Cty. Fed'n of Labor (AFL-CIO) v. I.N.S.*, 306 F.3d 842, 872 (9th Cir. 2002)).

"Plausible reasons" support Harris's imposition of ten-year conditions on Prime. The Attorney General has discretion to consider whether each individual transaction "may create a significant effect on the availability or accessibility of health care services to the affected community" and whether the transaction is "in the public interest." Cal. Corp. Code § 5917. Further, "[p]otential adverse effects on availability or accessibility of health care may be mitigated through provisions negotiated between the parties to the transaction, through conditions adopted by the Attorney General in consenting to the proposed transaction, or through any other appropriate means." Cal. Code Regs. tit. 11, § 999.5(f)(8)(A). Requiring Prime to continue services for ten years, instead of merely five years, plausibly appears to support the purposes enumerated in the Nonprofit Hospital Transfer Statute and its implementing regulations. (*See* Dkt. No. 62-1 at 35–36; Dkt. No. 74 at 21.) Moreover, Harris had "complete discretion" to determine whether her policy of requiring existing levels of essential healthcare services to be continued for at least five years would "be applied in any specific transaction under review." Cal. Code Regs. tit. 11, § 999.5(f)(8)(B)–(C). Harris had the authority to vary upward from a minimum floor of five years.

Prime complains that Defendants' proffered reasons are merely a post hoc justification. (Dkt. No. 69 at 38.) However, the Nonprofit Hospital Transfer Statute does not require the Attorney General to provide reasons for the decision. Nor does the Equal Protection Clause so require. *See Beach Commc'ns*, 508 U.S. at 315 ("[T]he absence of legislative facts explaining the distinction on the record has no significance in rational-basis analysis." (citation, internal quotation marks, alteration omitted) (citing *Nordlinger*, 505 U.S. at 15 (equal protection "does not demand for purposes of rational-basis review that a legislature or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification"))).

////

////

////

### 3. Pretext

"[A]cts that are malicious, irrational, or plainly arbitrary do not have a rational basis."[15] *Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985, 993 (9th Cir. 2007), *aff'd sub nom. Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591 (2008). "[I]n an equal protection claim based on selective enforcement of the law, a plaintiff can show that a defendant's alleged rational basis for his acts is a pretext for an impermissible motive." *Id.*

Prime argues that it has provided sufficient allegations of an impermissible motive on Harris's part, regardless of the plausibility of the alleged *quid pro quo* scheme. (Dkt. No. 69 at 39–40.) Specifically, Prime contends that "a plausible inference can certainly be raised . . . that Harris' motivation to impose the disputed conditions was because the SEIU-UHW opposed the Prime-DCHS transaction when Prime refused to unionize unrelated hospitals." (*Id.* at 39.)

At bottom, Prime alleges that Harris was motivated by politics:

Prime is informed and believes that Defendant Harris selectively enforced the Non-Profit Hospital Transfer Statute against Plaintiffs using arbitrary, capricious, onerous and unprecedented approval conditions because she is politically aligned

---

[15] As Prime points out, (Dkt. No. 69 at 25 n.6), Defendants overstate the Seventh Circuit's holding in *Brunson v. Murray*, 843 F.3d 698 (7th Cir. 2016). *Brunson* does not hold that both animus and the lack of any conceivable legitimate purpose must be demonstrated by a class-of-one plaintiff. *See* 843 F.3d at 705–08. Rather, the Seventh Circuit observed that "[t]he elements of class-of-one claims have remained unsettled" since a 2012 en banc decision, in which three opinions articulated three different standards for class-of-one claims. *Id.* at 706. One standard considers whether a rational basis can be conceived, regardless of whether it is established in the record or whether the basis occurred to the defendant, and gives intent no role in class-of-one suits outside of showing that discrimination exists. *Id.* A second standard requires the plaintiff to show that he or she was singled out for intentional discrimination by state actors who knew or should have known that they had no justification for singling the plaintiff out for unfavorable treatment. *Id.* A third standard articulates a multi-part test: a plaintiff must show that he or she was the victim of intentional discrimination at the hands of a state actor, that the state actor lacked a rational basis for so doing, and that the plaintiff had been injured by the intentional discrimination. *Id.* Instead of deciding which class-of-one standard to adopt, the Seventh Circuit expressly stated that the claim in *Brunson* survived summary judgment under all three standards raised in the intra-circuit doctrinal debate. *See id.* ("While we await a final resolution of the doctrinal debate, Brunson's claim survives summary judgment under all three standards."). While *Brunson* does not bind this Court or provide doctrinal clarity, *Brunson* underscores the unsettled nature of class-of-one law and the live questions with which courts continue to wrestle in this area of law.

against Plaintiffs as the result of her relationship with SEIU-UHW and Regan, and because Plaintiffs rejected SEIU-UHW's demands to unionize other Prime hospitals unrelated to the Prime-DCHS transaction.

(SAC ¶ 120; *see also* ¶ 6 (alleging that DCHS's list of weaknesses for Prime's bid "was short and primarily based on political opposition to the Prime proposal," and that Harris's review of Prime's bid "would likely be biased by her political relationship with unions"); ¶¶ 17, 19 (noting that SEIU-UHW is Harris's "political ally"); ¶¶ 18, 76 (alleging that Harris's conditional approval of the Prime-DCHS transaction was "political theater designed to protect her from political fallout"); ¶ 35 (alleging that Harris "curr[ied] favor with political campaign contributors"); ¶ 40 (detailing meetings with several of Harris's unnamed "political advisors"); ¶ 53 (positing that Harris "act[ed] as SEIU-UHW's political agent"); ¶ 83 (noting that it would be "politically impossible" for Harris to outright deny consent to the Prime-DCHS transaction); ¶ 83 (alleging that Harris and Regan aimed "to further their own political agenda" and recounting Regan's "boast[s] about his ability to control Harris and the political process in California"); ¶ 85 (noting "the transparently political nature of the Attorney General's approval process"); ¶ 102 (noting that "BlueMountain received praise and political support from SEIU-UHW"); ¶¶ 109, 111 (alleging that it was not "politically feasible" for Harris to impose five-year conditions on the BlueMountain-DCHS deal, and that unlike Prime, BlueMountain had the support of SEIU-UHW); ¶ 112 (alleging that SEIU-UHW agreed to provide political and financial support of Harris's Senate campaign).)

Do political motivations or considerations constitute a legally impermissible motive?  Does acceding to union political pressure dislodge all of the rational reasons underlying Harris's disparate treatment of Prime, rendering her acts malicious, irrational, or plainly arbitrary?  The answer remains unclear.[16]

---

[16] The lack of clarity further amplifies the Court's qualified immunity analysis.  *See infra* Part II.B.

In *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137 (9th Cir. 2004), an employer challenged on equal protection grounds the "Living Wage Ordinance" imposed by the City of Berkeley, "claim[ing] it was unfairly targeted when the City expanded coverage of the Living Wage Ordinance to only a handful of employers—between one and five—due to the geographical restrictions, as well as the limitations on the number of employees . . . and annual revenue." 371 F.3d at 1154–55. Like Prime, the employer contended that the City's true motive was to aid a unionization campaign directed at one of the employers which would be negatively impacted by the ordinance. *See id.* The Ninth Circuit deemed this argument "unpersuasive," as "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Id.* (quoting *Beach Commc'ns*, 508 U.S. at 315).[17] The Ninth Circuit concluded that the plaintiff's equal protection claim failed. *See id.* at 1155–56. To the extent the plaintiff raised a class-of-one claim, it, too, failed, because there was a rational basis for the City to treat the allegedly "targeted" businesses differently from their competitors. *See id.* at 1155–56.

While the Ninth Circuit wrote off as irrelevant the City's alleged motive to aid a unionization campaign in *RUI One*, *see id.*, the Ninth Circuit recently issued a decision suggesting a different course, *see Fowler Packing Co., Inc. v. Lanier*, 844 F.3d 809 (9th Cir. 2016). In *Fowler*, two employers challenged on equal protection grounds the California legislature's addition of carve-outs to safe harbor legislation that would otherwise protect employers from minimum wage liability. *See* 844 F.3d at 811–16. The plaintiffs—two of the only three corporate employers affected by the carve-outs—alleged that state legislators added the carve-outs to obtain the support of a labor union. *See id.* Tellingly, the three affected corporate employers were the defendants in the only three

---

[17] The Ninth Circuit also cited *Int'l Paper Co. v. Town of Jay*, 928 F.2d 480 (1st Cir. 1991), wherein the First Circuit "specifically rejected a claim that an environmental ordinance violated the Equal Protection Clause because its challengers alleged that its passage was motivated by a desire to restrict a business's power in dealing with unions." 371 F.3d at 1154–55 (citing *Int'l Paper*, 928 F.2d at 485).

pending wage-and-hour class actions filed by the labor union in the seven preceding years. *See id.* As a result of the carve-outs, the three employers would be precluded from using the safe harbor in the pending litigation. *See id.* Plaintiffs argued that the legislation failed to satisfy even rational basis review, because the only reason the carve-outs were included in the legislation was to procure the support of the union. *See id.* The Ninth Circuit agreed. *Id.* The Ninth Circuit observed, "[W]e can conceive of no other reason why the California legislature would choose to carve out these three employers other than to respond to the demands of a political constituent." *Id.* "Because that justification would not survive even rational basis scrutiny," the Ninth Circuit held that plaintiffs plausibly stated a claim that the carve-out provisions violated the Equal Protection Clause. *Id.*

The instant case bears more resemblance to the facts of *RUI One* than *Fowler*. In *Fowler*, the California legislature evinced an utter lack of any rational basis for adding the carve-outs, beyond currying political favor. That is not the present case. Here, there is a "reasonably conceivable state of facts that could provide a rational basis" for Harris's imposition of ten-year conditions on Prime. *Beach Commc'ns*, 508 U.S. at 313. Notwithstanding the above, the Court need not resolve any apparent tension between *RUI One*, *Fowler*, and the instant case today. If anything, the Ninth Circuit's recent holding in *Fowler* further militates in favor of concluding that the contours of class-of-one law were not clearly established at the time of Harris's conditional approval of the Prime-DCHS deal.

The Court's conclusion that Prime has insufficiently alleged the existence of similarly situated individuals, *see supra* Part II.A.1, and the Court's conclusion that Prime lacked a clearly established right at the time Harris conditionally consented to the Prime-DCHS deal, *see infra* Part II.B, supply independent grounds to dismiss Prime's SAC.

/ / / /

/ / / /

## B. Qualified Immunity

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Lower courts have discretion to decide which prong to address first. *Id.*

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Reichle v. Howards*, 566 U.S. 658 (2012)). While there need not be "a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *al-Kidd*, 563 U.S. at 741)). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The Supreme Court has "repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742; *see also City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1776 (2015) (stating the same). "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 742). The clearly established inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). "[T]he clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "Otherwise,

'[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" *Id.* (quoting *Anderson*, 483 U.S. at 639).

"[I]n the last five years" the Supreme Court "has issued a number of opinions reversing federal courts in qualified immunity cases." *White*, 137 S. Ct. at 551 (citing *Sheehan*, 135 S. Ct. at 1774 n.3 (collecting cases)). The Supreme Court has found it necessary to do so "both because qualified immunity is important to 'society as a whole,' and because as 'an immunity from suit,' qualified immunity 'is effectively lost if a case is erroneously permitted to go to trial.'" *Id.* (citations omitted).

 Here, Harris asserts the qualified immunity defense in response to Prime's equal protection claim against her in her personal capacity. (Dkt. No. 62-1 at 37–39.) For the reasons set forth in prior sections of this Order, *supra* Part II.A, Harris is entitled to qualified immunity on the first prong alone. While the qualified immunity Court need not continue on to discuss the second prong, the clearly established inquiry offers an additional, independent ground entitling Harris to qualified immunity.

Harris asserts that "the contours of the law existing at the time of Harris's decision would not have alerted her that imposing a mix of five and 10-year requirements on the maintenance of medical services was unconstitutional." (*Id.* at 38–39.) Harris states that she "know[s] of no case law imposing civil rights damage liability against a state Attorney General for discretionary conduct overseeing and protecting a state's charitable trusts for the public in a manner within her statutory authority." (*Id.* at 39.)

Prime cites the Ninth Circuit's qualified immunity analysis in *Gerhart v. Lake Cty., Mont.*, 637 F.3d 1013 (9th Cir. 2011) to argue that it had a clearly established right. (Dkt. No. 69 at 40–42.) In *Gerhart*, the plaintiff challenged the county commissioners' denial of his permit application for a lane approach on equal protection grounds. *See* 637 F.3d at 1014–15. Evidence showed that the "outright denial of an approach permit application [was] incredibly uncommon" in the county. *See id.* at 1018. The Ninth Circuit denied the defendant commissioners' qualified immunity defense, concluding that plaintiff's

"constitutional right not to be intentionally treated differently than other similarly situated property owners without a rational basis was clearly established at the time his permit application was denied" in 2008, eight years after the Supreme Court decided *Vill. of Willowbrook v. Olech*, 528 U.S. 562 (2000). *Id.* at 1025.

*Gerhart* is distinguishable. As the Ninth Circuit observed, *Olech* and *Gerhart* presented "exceptionally similar" facts. *Gerhart*, 637 F.3d at 1025. The facts of *Olech* are simple.

> [A] property owner had asked the village of Willowbrook to connect her property to the municipal water supply. Although the village had required only a 15–foot easement from other property owners seeking access to the water supply, the village conditioned Olech's connection on a grant of a 33–foot easement. Olech sued the village, claiming that the village's requirement of an easement 18 feet longer than the norm violated the Equal Protection Clause.

*Engquist*, 553 U.S. at 601. Like *Olech*, *Gerhart* involved state action which was not "based on a vast array of subjective, individualized assessments." *Id.* at 603. Rather, *Gerhart*'s limited universe of facts involved a lane approach permit denial.

This case involves broad amounts of discretion and complex facts, and the specific context of the case does not square easily with a class-of-one challenge. Did former Attorney General Harris violate clearly established law by imposing more stringent conditions on a nonprofit hospital transaction in response to political pressure from a labor union, where the law expressly conferred upon her broad discretion to impose such conditions, where the transaction—the largest of its kind—affected multiple communities, and where the conditions were otherwise supported by plausible reasons? Neither *Olech* nor *Gerhart* "placed the statutory or constitutional question beyond debate," such that it was "sufficiently clear that every reasonable official would have understood that what [Harris was] doing violates that right." *Mullenix*, 136 S. Ct. at 308 (citation and quotation marks omitted). Allowing Plaintiffs to constitutionalize their disagreement with what is, at bottom, discretionary state decisionmaking by alleging a

violation of an abstract right would disregard qualified immunity's "importan[ce] to society as a whole." *White*, 137 S. Ct. at 551 (citation and quotation marks omitted).

The Court is tasked with applying a legal test derived from the straightforward, confined facts of *Olech* to the sprawling facts of this case—facts which implicate, *inter alia*, former Attorney General Harris's broad statutory and regulatory discretion to impose conditions on nonprofit hospital transfers, her oversight over charitable organizations, complex business transactions between sophisticated parties, public comment and input from various groups, distinct communities' access to continuing health services, and the political process. It is unclear whether the similarly situated inquiry should—or can—be conducted without reference to the totality of the transactions; whether any two nonprofit hospital transfers can in fact be arguably indistinguishable; whether pretext reduces a plaintiff's obligation to show similarly situated comparators; whether responding to political pressure from a labor union can entirely dislodge the rational basis underlying the Attorney General's conditional consent to a nonprofit hospital transfer; and whether the Attorney General's discretionary decisionmaking is properly subject to a class-of-one claim.

"'It seems unlikely that the Supreme Court intended such a dramatic result in its *per curiam* opinion in *Olech*.'" *Engquist*, 478 F.3d at 996 (quoting *Campagna v. Mass. Dep't of Envtl. Prot.*, 206 F. Supp. 2d 120, 127 (D. Mass. 2002), *aff'd*, 334 F.3d 150 (1st Cir. 2003)). In holding that class-of-one claims have no application in the public employment context, the Supreme Court observed in *Engquist*,

> What seems to have been significant in *Olech* and the cases on which it relied was the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed. There was no indication in *Olech* that the zoning board was exercising discretionary authority based on subjective, individualized determinations—at least not with regard to easement length, however typical such determinations may be as a general zoning matter.

*Engquist*, 553 U.S. at 602–03.

The instant factual scenario is far less clear-cut than a straightforward zoning or "arm's-length regulation" matter. *Id.* at 602–04. This case foregrounds a "form[] of state action . . . which by [its] nature involve[s] discretionary decisionmaking based on a vast array of subjective, individualized assessments." *Id.* at 603; *see also Towery v. Brewer*, 672 F.3d 650, 660 (9th Cir. 2012) (quoting the same). Here, "allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise." *Engquist*, 553 U.S. at 603. Not only would the Attorney General's statutory discretion be undermined—federal courts would be assigned the daunting task of reviewing complex business transactions and state officials' decisions spanning broad domains, from public health to antitrust regulation.

In light of the above, the Court concludes that Harris is entitled to qualified immunity. Prime has not stated that Harris violated a constitutional right, and the right was not clearly established at the time of the challenged conduct.

### C. Injunctive Relief

"The Eleventh Amendment bars a suit against state officials when 'the state is the real, substantial party in interest.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984) (citation omitted). As a suit against a state official in his or her official capacity is effectively a suit against the state itself, "state officials sued in their official capacities are not 'persons' within the meaning of § 1983." *Doe v. Lawrence Livermore Nat. Lab.*, 131 F.3d 836, 839 (9th Cir. 1997) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70 (1989)). There is, however, one exception to this rule under the *Ex parte Young* doctrine: "When sued for *prospective injunctive relief*, a state official in his official capacity is considered a 'person' for § 1983 purposes." *Id.* (citing *Ex parte Young*, 209 U.S. 123, 159–160 (1908)). Put simply, the *Ex parte Young* exception "is available where 'a plaintiff alleges an ongoing violation of federal law, and where the relief sought is prospective rather than retrospective.'" *Id.* (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 294 (1997) (O'Connor, J., concurring)).

Prime seeks the following injunctive relief against the Attorney General in his official capacity:

> Entry of a permanent injunction . . . that enjoins the Attorney General of California from enforcing, directly or indirectly through third parties, the Non-Profit Hospital Transfer Statute, Corporations Code §§ 5914–5925, against Plaintiffs, including with respect to the DCHS Sale Agreement, in a manner that violates their right to equal protection of laws under the Fourteenth Amendment to the U.S. Constitution[.]

(SAC at 79.) Prime asserts that it will suffer irreparable injury because the Attorney General will prevent it from acquiring other nonprofit hospitals in California due to its continued rejection of SEIU-UHW's unionization demands. (SAC ¶ 126.) Although unclear, Prime asserts that absent injunctive relief, it will "potentially" be liable to DCHS for breach of the DCHS Sale Agreement, and will "be prevented from lawfully acquiring and operating the DCHS hospitals pursuant to the terms of the DCHS Sale Agreement should Prime and DCHS attempt to negotiate a sale/purchase of the DCHS hospitals in the future." (*Id.*)

First, to the extent Prime seeks relief against the Attorney General in his official capacity "with respect to the DCHS Sale Agreement," the Eleventh Amendment bars Prime from seeking such retrospective relief. Second, while "[a]n allegation of an ongoing violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke the *Young* fiction," *Coeur d'Alene Tribe*, 521 U.S. at 281, Prime's recital of Harris's past denials, both outright and allegedly *de facto*, of Prime's proposed nonprofit hospital transactions does not show that Becerra is committing an ongoing violation of federal law.

Prime's allegations are inextricably intertwined with Harris and her alleged actions. Prime has not shown—or even attempted to show—that the allegations underlying its prayer for injunctive relief apply to Becerra. Indeed, both Prime's SAC, filed at the end of Harris's tenure as Attorney General, and Prime's opposition brief are devoid of any mention of Becerra. (*See* Dkt. Nos. 57, 69.)

> [W]hen a public official is sued in his official capacity and the official is replaced or succeeded in office during the pendency of the litigation, the burden is on the complainant to establish the need for declaratory or injunctive relief by demonstrating that the successor in office will continue the relevant policies of his predecessor.

*Kincaid v. Rusk*, 670 F.2d 737, 741 (7th Cir. 1982); *see also Mayor of Philadelphia v. Educ. Equal. League*, 415 U.S. 605, 622 (1974) ("Where there have been prior patterns of discrimination by the occupant of a state executive office but an intervening change in administration, the issuance of prospective coercive relief against the successor to the office must rest, at a minimum, on supplemental findings of fact indicating that the new officer will continue the practices of his predecessor."); *Spomer v. Littleton*, 414 U.S. 514, 689–90 (1974) (holding that there may no longer be a controversy where the wrongful conduct charged in plaintiffs' § 1983 claim for injunctive relief was personal to the former state attorney and inapplicable to the succeeding state attorney, notwithstanding the fact that the former state attorney had also been sued in his official capacity). Here, although Prime originally sued Harris in her official and individual capacities, it is plain that Prime's allegations are personal to Harris and shed no light on Becerra's prospective practices and policies. Prime, despite the opportunity to do so in its opposition brief, did not attempt to provide supplemental facts to substantiate its claim for prospective injunctive relief against Attorney General Becerra. (*See* Dkt. No. 69.) Nor did it request leave to amend to do so. (*See id.*)

Accordingly, the Court **GRANTS** Defendants' motion to dismiss Prime's claim for injunctive relief against Attorney General Becerra in his official capacity.

### D. *Younger* Abstention

Defendants request, in the alternative, that the Court abstain and dismiss the instant action under the *Younger* abstention doctrine. (Dkt. No. 62-1 at 42–44.) In *Younger v. Harris*, the Supreme Court set forth the principles underlying what is now known as *Younger* abstention. *See* 401 U.S. at 37, 43–54 (1971). At its core, *Younger* "reaffirmed the long-standing principle that federal courts sitting in equity cannot, absent exceptional

circumstances, enjoin pending state criminal proceedings." *ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 758 (9th Cir. 2014) (citing *Younger*, 401 U.S. at 43–54). The Supreme Court "later extended the *Younger* principle to civil enforcement actions 'akin to' criminal proceedings and to suits challenging 'the core of the administration of a State's judicial system.'" *Id.* (citations omitted).

Younger abstention is available only in "three exceptional categories" of cases. *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 592 (2013). These categories are: "(1) 'parallel, pending state criminal proceeding[s],' (2) 'state civil proceedings that are akin to criminal prosecutions,' and (3) state civil proceedings that 'implicate a State's interest in enforcing the orders and judgments of its courts.'" *ReadyLink*, 754 F.3d at 759 (quoting *Sprint*, 134 S. Ct. at 588).

> In civil cases, *Younger* abstention is appropriate only when the following elements are satisfied: the state proceedings: (1) are ongoing, (2) are quasi-criminal enforcement actions or involve a state's interest in enforcing the orders and judgments of its courts, (3) implicate an important state interest, and (4) allow litigants to raise federal challenges.

*Id.* If these four elements are met, federal courts then proceed to "consider whether the federal action would have the practical effect of enjoining the state proceedings and whether an exception to *Younger* applies." *Id.*

This case does not satisfy the requirements for *Younger* abstention. Relying on nonbinding case law,[18] Defendants frame the instant action as a "quasi-judicial proceeding" that falls within the second category of *Younger* cases. (Dkt. No. 62-1 at

---

[18] The Eighth Circuit held in a pair of decisions that a state insurance commissioner's rejection of plaintiff's application to acquire control of in-state insurance companies was judicial in nature and constituted an ongoing state proceeding for *Younger* purposes. *See Alleghany Corp. v. McCartney*, 896 F.2d 1138, 1143 (8th Cir. 1990); *Alleghany Corp. v. Pomeroy*, 898 F.2d 1314, 1316 (8th Cir. 1990). The Eighth Circuit observed that the director of insurance "investigated the facts surrounding [plaintiff's] proposed acquisition, and based on this fact-intensive inquiry, refused to permit the acquisition." *McCartney*, 896 F.2d at 1132. Even if the Court were bound by these Eighth Circuit decisions, it is unsettled whether or not the quasi-criminal enforcement action was ongoing. *See infra* n.19.

42–44; Dkt. No. 74 at 24.)  Specifically, Defendants point out that the Attorney General's review of Prime's proposed acquisition involved a fact-based investigation, public hearing and comment, and a written decision that may be reviewed in state court for an abuse of discretion.  (*Id.*)  Further, Defendants analogize the Attorney General's exercise of discretion to a license revocation proceeding, reasoning that "a decision not to consent amounts to a rejection that deprives an acquiring entity of its ability to acquire the facility."  (Dkt. No. 62-1 at 43.)

Defendants' attempt to analogize the Attorney General's review process to a criminal prosecution is strained.

> For civil enforcement actions that are akin to criminal proceedings, however, "a state actor is routinely a party to the state proceeding and often initiates the action," the proceedings "are characteristically initiated to sanction the federal plaintiff . . . for some wrongful act," and "[i]nvestigations are commonly involved, often culminating in the filing of a formal complaint or charges."

*ReadyLink*, 754 F.3d at 759 (quoting *Sprint*, 134 S. Ct. at 592).  Here, the Attorney General's review of Prime's proposed acquisition does not bear any of the characteristics enumerated above.  The Supreme Court has warned against "divorc[ing]" the *Younger* abstention factors "from their quasi-criminal context," as doing so "would extend *Younger* to virtually all parallel state and federal proceedings, at least where a party could identify a plausibly important state interest."  *Sprint*, 134 S. Ct. at 593.  Heeding the Supreme Court's guidance that "abstention from the exercise of federal jurisdiction is the 'exception, not the rule,'" *id.* (citation omitted), the Ninth Circuit has likewise cautioned against indiscriminately construing the initiation of any quasi-judicial administrative proceeding as a quasi-criminal civil enforcement action, *see ReadyLink*, 754 F.3d at 760.

Even if this case presented a quasi-criminal enforcement action, it remains unsettled whether or not the state proceeding would be considered ongoing.  The Ninth Circuit has expressly declined to decide if a state proceeding is ongoing where "a state administrative proceeding is final, and state-court judicial review is available but has not

been invoked."[19]  *San Jose Silicon Valley Chamber of Commerce Political Action Comm. v. City of San Jose*, 546 F.3d 1087, 1093 (9th Cir. 2008).  Indeed, the Supreme Court has stated that this is an open question.  *Id.* (citing *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 370 n.4 (1989)).  Given the uncertainty surrounding this open question of law, this Court declines to hold that a state proceeding is ongoing in the instant case.

This case does not satisfy the requirements for *Younger* abstention.  Defendants' request for *Younger* abstention is **DENIED**.

**CONCLUSION**

For the foregoing reasons, the Court **DENIES** Defendants' motion to strike Plaintiffs' *quid pro quo* allegations and **GRANTS** Defendants' motion to dismiss Plaintiffs' SAC.  (Dkt. No. 62.)

**IT IS SO ORDERED.**

Dated:  August 16, 2017

Hon. Gonzalo P. Curiel
United States District Judge

---

[19] The Ninth Circuit withdrew the opinion on which Defendants rely.  *See San Jose Silicon Valley*, 546 F.3d at 1094 (citing *Nev. Entm't Indus., Inc. v. City of Henderso*n, 8 F.3d 1348 (9th Cir. 1993) (per curiam), *withdrawn by* 21 F.3d 895 (9th Cir.), *on reh'g* 26 F.3d 131 (9th Cir. 1994) (unpublished disposition) (holding that the *Younger* abstention question was moot)).